```
 1

 2

 3   ---------------------------------------X
                                       : 18-22552 (RDD)
 4   In re:                            :
                                       :
 5      MICHAEL P. D'ALESSIO,          :
                                       : July 12, 2018
 6                Debtor.              :
     ---------------------------------------X
 7

 8                    TRANSCRIPT OF 341 MEETING
                      BEFORE MARIANNE O'TOOLE
 9

10   APPEARANCES:

11
     For the Debtor:           SANFORD P. ROSEN, ESQ.
12                             Rosen & Associates
                               747 Third Avenue
13                             New York, New York 10017

14   For the Trustee:          SALVATORE LaMONICA, ESQ.
                               LaMonica Herbst & Maniscalco, LLP
15                             3305 Jerusalem Avenue
                               Wantagh, New York 11793
16
     The Trustee:              MARIANNE O'TOOLE
17                             22 Valley Road
                               Katonah, New York 10536
18
     For Preferred Bank:       MATTHEW KYE, ESQ.
19                             Kye Law Group, P.C.
                               201 Old Country Road, Suite 120
20                             Melville, New York 11747

21   For the Millers, et al:   JAMES J. VINCEQUERRA, ESQ.
                               Alston & Bird LLP
22                             90 Park Avenue
                               New York, New York 10016
23

24                    [Appearances continue next page.]
25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

APPEARANCES CONTINUED:

For 145 E. 62nd St.:        JASON LEIBOWITZ, ESQ.
                                Kriss & Feuerstein, LLP
                                360 Lexington Avenue, Suite 1200
                                New York, New York 10017

For Attis Properties:          DAWN KIRBY, ESQ.
                                DelBello Donnellan Weingarten Wise &
                                 Wiederkehr, LLP
                                1 North Lexington Avenue
                                White Plains, New York 10601

For Andrew West:               ANDREW WEST, Pro Se

For [inaudible] Bank:          SCOTT MAGESTI, ESQ.


Court Transcriber:             MARY GRECO
                                TypeWrite Word Processing Service
                                211 N. Milton Road
                                Saratoga Springs, NY 12866

1          MS. O'TOOLE:  <u>Michael Paul Enterprises, LLC</u>, 18-

2    20004.  What I'm going to do in anticipation of these cases

3    being jointly administered, I'm calling them all

4    simultaneously, so indulge me while I just put on the record

5    145-147 East 62nd Street Holdings LLC, 18-2005; 184 East 64th

6    Street Holding LLC, 18-22886; 184 East 64th Street Associates

7    LLC, 18-22887; Bluestone 184 LLC, 18-22888; Bluestone 67 LLC,

8    18-22889; 227 East 67th Street Associates LLC, 18-22890; 227

9    East 67th Street Holdings LLC, case number 18-22891; case

10   number 18-22892, 145-147 East 62nd Street Associates; case 18-

11   22893, Bluestone 163-156 LLC; case 18-22894, 163-165 East 62nd

12   Street Associates; 18-22895, 163-165 East 62nd Street Holdings

13   LLC; case 18-22904, 3 Sandpiper Court Holding LLC; case

14   18-22909, 45 Middle Pond Road Associates LLC; case 18-22910,

15   43 Middle Pond Road Associates LLC; case 18-22911, 41 Middle

16   Pond Road Associates LLC; case 18-22952, 43 Middle Pond Road

17   Holding LLC; case 18-22953, 4145 MPR Holding LLC; 18-22954,

18   Bluestone Sandpiper LLC; case 18-22955, 3 Sandpiper Court LLC;

19   case 18-22965, 1517 Circle Holding LLC; case 18-22967, MBI

20   Partners LLC; case 18-22991, 15 Circle Rd MBI LLC; and finally

21   case 18-22992, 17 Circle Rd MBI LLC.

22          Okay.  So the first thing first, counsel, is do you

23   have the signature pages for those petitions?  Thank you.  And

24   then if folks would note their appearances, please.  Anybody?

25          MR. KYE:  Matthew Kye, The Kye Law Group for

1  Preferred Bank.

2  　　　　MS. O'TOOLE:  Thank you.  Anybody else wish to note

3  their appearance?

4  　　　　MR. VINCEQUERRA:  James Vincequerra from Alston &

5  Bird for David Miller, Allan Miller and a number of other

6  similarly situated investors.

7  　　　　MS. O'TOOLE:  Okay.  And I will note that a Richard

8  A. Auerbach appeared for City Iron Smith in the context of the

9  Michael Paul case from McBreen & Kopko but he had the wrong

10  time this morning and I indicated I would note his appearance.

11  Anybody else wish to note their appearance?

12  　　　　MR. LEIBOWITZ:  Jason Leibowitz from Kriss &

13  Feuerstein on behalf of 145 East 62nd Street Lender, LLC.

14  　　　　MS. O'TOOLE:  Thank you.

15  　　　　MALE SPEAKER:  David Kriss?

16  　　　　MR. LEIBOWITZ:  Yes.

17  　　　　MS. KIRBY:  Dawn Kirby; DelBello Donnellan for Attis

18  Property.

19  　　　　MR. WEST:  Andrew West for self and family.

20  　　　　MS. O'TOOLE:  Thank you.

21  　　　　MR. MAGESTI:  Scott Magesti [inaudible] for

22  [inaudible] Bank.

23  　　　　MS. O'TOOLE:  Anybody else wish to note their

24  appearance?

25  　　　　Okay.  I do note that there are other individuals

1   here that chose not to note their appearance.

2   BY MS. O'TOOLE:

3   Q.   As an administrative matter, sir, if you'd raise -- first

4   state your name.

5   A.   Michael D'Alessio.

6   Q.   And you appeared last month during my hearings and I

7   looked at your identification.

8          MS. O'TOOLE:  Do any -- I'll start with this, do any

9   creditors wish to object to my serving as the trustee?  I'll

10  serve as the trustee in this matter then.

11  Q.   And so you were here the last time, Mr. D'Alessio, in

12  your personal bankruptcy, is that correct?

13  A.   Yes.

14  Q.   And at that time I was able to verify your ID by your

15  driver's license, correct?

16  A.   Yes.

17  Q.   Have you brought your Social Security card with you

18  today?

19  A.   I don't have one.

20  Q.   So your personal bankruptcy can't be closed until I see

21  your Social Security card.  You need to --

22  A.   Order a new one.

23         MR. ROSEN:  He's applied for one.

24  Q.   Yes.  You need to order it.  And then you'll need to

25  appear in person by arrangement either at my office or

1  otherwise, but as I said the last time, that's not in the

2  context of the corporate cases but that is in the context of

3  your personal case.

4  A.   Okay.

5  Q.   The next thing I'd like to do is to run through each of -

6  - counsel has brought each of the petitions with signatures

7  now and I'd like to run through each of them and ask you did

8  you -- you heard the cases that I read, correct?

9  A.   Yes, I did.

10 Q.   Did you review the petition in each of those cases?

11 A.   Yes.

12 Q.   And did you sign the petition in each of those cases?

13 A.   Yes.

14 Q.   Did you sign those petitions on behalf of the debtor in a

15 management position?

16 A.   Yes.

17 Q.   All right.  So the first petition that I have a signature

18 page is 17 Circle Road MBI LLC.  Do you recognize the

19 signature on that page?

20 A.   Yes.

21       MS. O'TOOLE:  All right.  As I read them, could

22 [inaudible] check off which ones so [inaudible] two pages.

23 Q.   The next one I'm going to show is [inaudible].  These go

24 together, these go together.  Okay.  The next page is Michael

25 Paul Enterprises LLC.  And did you sign that petition in the

1  capacity of a managing member?

2  A.    Yes.

3  Q.    And did you review the petition before you signed it?

4  A.    Yes.

5  Q.    Is that your signature that appears on the petition?

6  A.    Yes.

7  Q.    The next entity that entity that I have here is 3

8  Sandpiper Court LLC, and did you sign that petition in the

9  capacity as a manager?

10 A.    Yes.

11 Q.    Is that your signature that appears on the declaration?

12 A.    Yes.

13 Q.    All right.  The next is 3 Sandpiper Court Holding LLC.

14 Did you sign that petition in the capacity as the manager?

15 A.    Yes.

16 Q.    And is this your signature which appears on the voluntary

17 petition?

18 A.    Yes.

19 Q.    1517 Circle Holding LLC.  Did you sign that as the co-

20 manager of MBI Partners LLC, managing member of the debtor?

21 A.    Yes.

22 Q.    Is this your signature which appears on that petition?

23 A.    Yes.

24 Q.    Next I have 4145 MPR Holding LLC.  You signed that

25 petition as a manager?

1    A.    Yes.

2    Q.    Is that your corporate capacity with respect to that

3    debtor?

4    A.    Yes.

5    Q.    Is that your signature that appears on that petition?

6    A.    Yes.

7    Q.    41 Middle Pond Road Associates.  Did you serve as a

8    manager for that entity as well?

9    A.    Yes.

10   Q.    Is this your signature which appears on that petition?

11   A.    Yes.

12   Q.    43 Middle Pond Road Associates LLC.  Did you sign that

13   petition in your capacity as manager?

14   A.    Yes.

15   Q.    Is this your signature that appears on that petition?

16   A.    Yes.

17   Q.    43 Middle Pond Road Holding LLC.  Did you sign that

18   petition as the manager?

19   A.    Yes.

20   Q.    Is that your signature that appears on the petition?

21   A.    Yes.

22   Q.    45 Middle Pond Road Associates LLC.  Did you sign that

23   petition as a manager?

24   A.    Yes.

25   Q.    And is that your signature on the petition?

1  A.    Yes.

2  Q.    145-147 East 62nd Street Associates.  You signed that

3  petition as the manager, correct?

4  A.    Yes.

5  Q.    Is that your signature that appears on that petition?

6  A.    Yes.

7  Q.    145-147 East 62nd Street Holding LLC.  Did you sign that

8  as the managing member of Fortress Capital Partners LLC FCP

9  145 Holding?

10  A.    Yes.

11  Q.    And is this your signature on that petition?

12  A.    Yes.

13  Q.    163-165 East 62nd Street Associates.  Did you sign that

14  petition as a manager?

15  A.    Yes.

16  Q.    And is this your signature which appears on that

17  petition?

18  A.    Yes.

19  Q.    163-165 East 62nd Street Holdings.  Did you sign as

20  manager on that petition?

21  A.    Yes.

22  Q.    Is that your signature on the petition?

23  A.    Yes.

24  Q.    184 East 64th Street Associates LLC.  Did you sign as

25  manager on that petition?

1  A.    Yes.

2  Q.    Is this your signature on the petition?

3  A.    Yes.

4  Q.    184 East 64th Street Holding LLC.  Did you sign that

5  petition as manager?

6  A.    Yes.

7  Q.    Is this your signature on the petition?

8  A.    Yes.

9  Q.    227 East 67th Street Associates LLC.  Did you sign as a

10  manager?

11  A.    Yes.

12  Q.    Is that your signature as manager on the petition?

13  A.    Yes.

14  Q.    227 East 67th Street Holdings LLC.  Did you sign that

15  petition as a manager?

16  A.    Yes.

17  Q.    Is that your signature on the petition?

18  A.    Yes.

19  Q.    Bluestone 67 LLC.  Did you sign that petition as a

20  manager?

21  A.    Yes.

22  Q.    And is that your signature on the petition?

23  A.    Yes.

24  Q.    Bluestone 163-165 LLC.  Did you sign that petition as a

25  manager?

1  A.    Yes.

2  Q.    Is this your signature --

3         MALE SPEAKER:  Excuse me.  Okay.  I'm fine.

4         MS. O'TOOLE:  That's fine.

5  Q.    167 -- I'm sorry, is that your signature on the petition?

6  A.    Yes.

7  Q.    I'm going to just do that one again because I'm not sure.

8  It's Bluestone 163-165 LLC.  Did you sign that petition as a

9  managing member?

10 A.    Yes.

11 Q.    Is that your signature on the petition?

12 A.    Yes.

13 Q.    Bluestone 184 LLC.  Did you sign as manager?

14 A.    Yes.

15 Q.    Is this your signature on the petition?

16 A.    Yes.

17 Q.    Bluestone Sandpiper LLC.  Did you sign as the managing

18 member?

19 A.    Yes.

20 Q.    Is this your signature on that petition?

21 A.    Yes.

22 Q.    MBI Partners LLC.  Did you sign as manager on the

23 petition?

24 A.    Yes.

25 Q.    And is this your signature which appears on the petition?

1  A.    Yes.

2  Q.    15 Circle Road MBI LLC.  And it's R-D, it's not Road, did

3  you sign as co-manager of the manager of the debtor sole

4  member?

5  A.    Yes.

6  Q.    Is that your signature on the petition?

7  A.    Yes, it is.

8         MS. O'TOOLE:  Do we have them all?

9         MALE SPEAKER:  Yes.

10         MS. O'TOOLE:  Okay.  All right.  Are these --

11         MALE SPEAKER:  [Inaudible].

12         MS. O'TOOLE:  Thank you.  We can keep these?

13         MALE SPEAKER:  [Inaudible].

14         MS. O'TOOLE:  [Inaudible].

15  Q.    So the first question I have is when we were here last

16  for your individual bankruptcy we went through where documents

17  would be located and stuff.  At this juncture I don't have any

18  of the emails.  And so I'm going to then ask you how were

19  emails stored or -- well, withdrawn.  How were the emails --

20  what emails did you use on a daily basis?

21  A.    Michael Paul Enterprises.

22         MR. ROSEN:  It's Office 365.

23         MS. O'TOOLE:  It's Office 365.

24         MR. ROSEN:  Yeah, it's in the cloud.

25         MS. O'TOOLE:  It's in the cloud.

1      MR. ROSEN:  And we'll make arrangements to get you

2  the [inaudible].

3      MS. O'TOOLE:  Okay.

4  Q.   And then the next thing is I have received a drive that

5  has certain documents.  I don't see the daily bookkeeping.

6  Was that maintained by QuickBooks or otherwise?  So for

7  instance --

8  A.   Daily bookkeeping?

9  Q.   Monthly, daily.  So we have all these entities.  There

10 are several that own properties.  Some own properties that are

11 occupied by tenants.  So if there was a virtual doorman, if

12 there was a Con Ed bill, if there was, you know, an intercom

13 bill that gets paid, where were those?

14 A.   All in QuickBooks.

15 Q.   In QuickBooks.  And how about the supporting documents

16 for those invoices?  So if there's a Con Ed bill that comes

17 into the office --

18 A.   We're paperless.  So it would be scanned.

19 Q.   Okay.  And is it going to be scanned -- where does it get

20 saved when it's scanned?

21 A.   In the particular project folder like 145 East 62nd Street

22 Con Ed.

23 Q.   So you're saying --

24 A.   Virtual Doorman.

25 Q.   -- all of the routine bills should be stored under the

1  name of the entity in the D drive that I received a copy?

2  A.   Correct.

3  Q.   On a monthly basis that occurred?

4  A.   Yes.

5  Q.   Okay.  Where is the QuickBooks?  Who has the QuickBooks?

6  A.   I think it was all turned over.

7  Q.   We don't -- I will say I don't have access to QuickBooks

8  yet.  And I gather from your answer a willingness to provide

9  it.  We need the QuickBooks and we need them as soon as

10  possible to the extent I'm going --

11  A.   It was turned over the day after we met.

12  Q.   So I received the D drive.

13  A.    I brought it down to --

14        MR. MANISCALCO:  The drive itself was picked up.

15        MR. D'ALESSIO:  That has everything on it.

16        MS. O'TOOLE:  The QuickBooks too?

17        MR. MANISCALCO:  I don't think it has QuickBooks in

18  it.

19        MR. D'ALESSIO:  Absolutely.

20  Q.   Well, let me just say this.  We don't have to do back and

21  forth.  Who can walk us through where we find it on the drive

22  that we received?  Is that Rita?

23  A.   Do you want to come to my office and go through it with

24  Rita?

25  Q.   Well, that's fine.  We can do that.  I just need to make

1  sure --

2          MALE SPEAKER:  Rita is the answer.

3  Q.   -- that I have an image of the QuickBooks.

4          MALE SPEAKER:  She has the -- it's passworded.

5          MR. MANISCALCO:  She still has the copy of

6  QuickBooks --

7          MALE SPEAKER:  Yes.

8          MR. MANISCALCO:  -- is what you're saying?

9          MALE SPEAKER:  Yes.

10          MR. D'ALESSIO:  Yeah.

11          MR. MANISCALCO:  Did each entity have a separate

12  QuickBooks?

13          MR. D'ALESSIO:  Yes.

14          MS. O'TOOLE:  And just for the purposes of the

15  record, that is Sal LaMonica of LaMonica Herbst and Maniscalco

16  that will also be asking questions to the extent we need

17  clarification.

18  Q.   So the bills, the receipts and the invoices will be

19  reflected in the particular folder for the particular entity?

20  A.   Correct.

21  Q.   And there are no paper documents anywhere with respect to

22  that.

23  A.   No.

24  Q.   Okay.  What if one entity had a loan against another

25  entity or an individual had a loan.  Are there documents that

1  reflect those loans?

2  A.   It would be in a project folder.

3  Q.   Are there notes?

4  A.   No.  There would only be --

5  Q.   Book entries?

6  A.   First of all, if there was loans -- do you mean like a

7  bank loan?

8  Q.   No.

9  A.   You mean an inter-company loan?

10  Q.   If there's an inter-company.

11  A.   There will be nothing at all.

12  Q.   Okay.  So --

13  A.   It'll be documented in QuickBooks.

14  Q.   So for instance, where East 62nd Street, there was a loan

15  to Michael Paul of 1.7 million, where do I -- I see it --

16  A.   QuickBooks.

17  Q.   -- on the petition but you're saying it's going to be a

18  book entry in QuickBooks but there's no corresponding

19  document, is that correct?

20  A.   No.  It's correct.

21  Q.   With respect -- this is a very global question, but with

22  respect to any particular LLC, if there was going to be a

23  loan, would there be any meeting with anybody to approve that

24  or was that a matter of you simply saying I'm going to take a

25  loan from one entity to the other?

1  A.   Simply me saying I'm going to take a loan from one entity

2  to the other.

3  Q.   Did you consult with anyone when you were doing that?

4  A.   No.

5  Q.   Aspen Management LLC, when was that formed?

6  A.   I don't know the date.  I don't recall.

7  Q.   Okay.  And is that the 100 percent owner of Michael Paul

8  Enterprises?

9  A.   It has nothing to do with Michael Paul Enterprises.

10 Q.   There's no ownership relationship between Michael Paul

11 and Aspen?

12 A.   None.

13 Q.   Okay.

14 A.   Aspen is a management company.

15 Q.   Aspen Management LLC, when was that formed?  Do you know?

16 A.   I don't know.

17 Q.   Was it formed in the State of New York?

18 A.   I believe so.  New York or Delaware.

19 Q.   Who are the members?

20 A.   I believe the sole member is Ronald D'Alessio.

21 Q.   And Ronald D'Alessio, who is he?  Your --

22 A.   My brother.

23 Q.   And was he since the date of formation the sole member?

24 A.   No.

25 Q.   If I go to the website it shows you, correct?

1  A.    Correct.

2  Q.    When did he become the sole member?

3  A.    Several months ago.

4  Q.    So prior to the bankruptcy filing?

5  A.    Correct.

6  Q.    And was that before or after using as the benchmark the

7  TRO that was entered in the state court proceeding?

8  A.    Before.

9  Q.    So was it before or after the litigation in the state

10  court was commenced?

11  A.    It might have been after.  That I don't recall the

12  specific date.

13  Q.    Were you the 100 percent member prior to your brother

14  becoming a member?

15  A.    Yes.

16  Q.    And were you the managing member of that entity?

17  A.    Yes.

18  Q.    Was there any meetings or board meeting entry or

19  documentation transferring the ownership from you to your

20  brother?

21  A.    No.

22  Q.    How would one know when that occurred?

23  A.    There was a formal agreement which would be in the

24  computer.

25  Q.    And why did you transfer the Aspen Management LLC to your

1    brother?

2    A.   Cause it has a -- it manages buildings and is a operating

3    entity with cash flow.

4    Q.   Okay.  So it's a valuable entity, correct?

5         MALE SPEAKER:  I don't know if he said that.

6    A.   Yeah, it's not really a valuable entity.  Now it's not

7    worth anything.

8    Q.   Well, let me just say we went through the 24 affiliated

9    cases that filed, correct?

10   A.   Correct.

11   Q.   But there are other buildings that you own directly or

12   indirectly or family members of yours own, correct?  Unrelated

13   to the -- withdrawn.  Does Aspen Management manage properties

14   other than the debtor entities?

15   A.   Other than the debtor entities that you just called off?

16   Q.   Yes.

17   A.   Yes.

18   Q.   And so the real property of the debtor entities include

19   the property at 145-147 East 62nd Street, the property at 227

20   East 67th Street, the real property at 184 East 64th Street, the

21   property at 1517 Circle Road in Scarsdale, 4143 Middle Pond

22   Road, correct?  And 3 Sandpiper Court in Westhampton, correct?

23   A.   Correct.

24   Q.   Of those buildings or of that real property --

25   A.   Most of those don't pay management fees.

1  Q.   Well, correct.  That was the next thought we were getting

2  to.  There's three that have tenants, correct?  62nd, 64th, and

3  67th.  Those three --

4  A.   67th pays a management fee, 64th pays a management fee.

5  Q.   Yes.

6  A.   62nd never paid a management fee.

7  Q.   So that would be slightly inconsistent with what Rita had

8  told us.  But I suppose the books and records would verify

9  that.

10  A.   Whatever the books and records --

11  Q.   So Aspen Management was managing the apartment building,

12  correct?

13  A.   Correct, correct.

14  Q.   In addition, Aspen Management manages other properties,

15  correct?

16  A.   I think it has two other properties which are I guess

17  [inaudible] bankruptcy.

18  Q.   Are those the --

19  A.   The Tremont Avenue, 3100.  The 3100 East Tremont, the

20  3219 East Tremont, and the 3225 East Tremont.

21  Q.   And does it also manage the property is it 3200, the

22  property that was transferred --

23  A.   No.

24  Q.   -- to your wife as part of the divorce?

25  A.   No.

1  Q.    Had it historically managed that property?

2  A.    Yes.

3  Q.    And did there come a time when it stopped managing that

4  property?

5  A.    Yes.

6  Q.    And when was that?

7  A.    When it was transferred to Yvonne.

8  Q.    Okay.  And what is the business purpose of Aspen

9  Management?

10 A.    Just a management company.

11 Q.    And is it your belief that Aspen Management -- does Aspen

12 Management hold any other LL -- own any other LLCs?

13 A.    No.

14 Q.    No?

15 A.    No.

16 Q.    Does it hold an interest in any other LLCs?

17 A.    No.

18 Q.    And you don't believe it's --

19 A.    It's worth nothing if it makes you --

20 Q.    So let me just say it's not the value.  I'm trying to

21 figure out the ownership structure.  Okay.  I don't --

22 A.    It owns nothing.

23 Q.    Okay.  So I'm going to turn to the Michael Paul

24 Enterprises LLC petition.  That entity was formed in or about

25 November of 2006, correct?

1 A.    If that's what it says.  I don't recall the date.

2 Q.    Well, I can represent to you that that's what I located

3 with the Secretary of State for the date that that entity was

4 formed.

5 A.    Okay.

6 Q.    Does that refresh your recollection in any way as to when

7 it was formed?  Yes?

8 A.    It's fine.

9 Q.    And so that's fine.  I know it's colloquial and you and I

10 are communicating, but the answer is yes or no.

11 A.    Yes.

12 Q.    Does that sound about when it was formed?

13 A.    Yes.

14 Q.    And what was the purpose of Michael Paul Enterprises?

15 A.    A general contracting company.

16 Q.    And did it manage any of the other -- withdrawn.  Did

17 Michael Paul Enterprises provide services to any of the other

18 debtor LLCs?

19 A.    All of them.

20 Q.    So it provided construction services?

21 A.    Correct.

22 Q.    What other services did it provide?

23 A.    Just construction.

24 Q.    And explain that to me.  If you were building, for

25 instance, 1517 Circle Drive in Scarsdale, was it the project

1  manager?  What was it doing?

2  A.    It was the project manager.

3  Q.    Showing you the Michael Paul Enterprises LLC statement of

4  financial affairs attached to the petition, question number

5  one, it indicates for the gross revenues from the business for

6  the year 2018 and then for the year 2017, do you see that?

7  A.    Yes.

8  Q.    But it indicates that the gross revenues are unknown.

9  Why are they unknown?

10 A.    Because the accountant didn't close it out yet.

11 Q.    Well in the prior, in 2016, the gross revenues were 25

12 million, is that correct?

13 A.    Yes.

14 Q.    Do you have any -- on QuickBooks do you reflect any --

15 A.    I have no idea what the number is.

16 Q.    Well, would that be reflected in QuickBooks in any way?

17 A.    Correct.

18 Q.    And so when you undertook to file the bankruptcy

19 petitions, did you attempt to ascertain what the gross

20 revenues were?

21 A.    No.

22 Q.    And what about that would require the accountant?

23 Wouldn't that be in QuickBooks, just the amount of money that

24 was received?

25 A.    You would have to look at it.  That's something the

1  accountant would do.

2  Q.    Okay.

3  A.    My office wouldn't do.

4  Q.    All right.  And you didn't do that in '16, '17, or '18,

5  is that correct?

6  A.    Correct.

7  Q.    And then the accounts that were closed at Bridgehampton

8  National Bank in November of 2017, were there any monies in

9  those accounts at the time that they were closed?

10 A.    There were.  I believe the bank swept them all.

11 Q.    And where were the records with respect to that be

12 maintained?

13 A.    In QuickBooks.

14 Q.    Okay.  Did you receive any correspondence with respect to

15 sweeping the account?

16 A.    Yes.

17 Q.    And that would be located where?

18 A.    After the fact we sent -- I think we sent them a letter

19 from our attorney.

20 Q.    Okay.  So if there's correspondence for the debtor LLCs

21 with an attorney, where's that located?

22 A.    In the file under that project or that bank.

23 Q.    So and if there are bank statements for any bank

24 accounts, for instance and specifically Michael Paul

25 Enterprises, where are the bank statements?

1  A.   I believe when they finalize each month, reconcile, they

2  make a copy of the statement and it's in the QuickBooks file.

3  Q.   So I'm making demand -- well, we'll try to work that out

4  --

5  A.   You have it all.

6  Q.   -- with Rita but I don't have the bank statements and I

7  don't have correspondence from the attorneys to the extent

8  they step into the shoes of the LLC and there's any kind of

9  correspondence with the attorneys.  Okay?

10 A.   What I'd like to do is set a date that maybe you or

11 whoever you want, your designee, meet with Rita and I'll be

12 there as well and --

13 Q.   I'm happy to meet with Rita.  I'm going to go through my

14 demands.  To the extent Rita can facilitate getting them --

15 A.   We gave them to you already though.

16 Q.   I don't have them.  Listen, I'm not challenging you.  We

17 have not located them.  We may be incompetent, we may not be

18 looking in the right places, but I'm telling you what we're

19 looking for.

20 A.   Okay.

21 Q.   And so these are the demands and you're going to work

22 with us.  I'm just saying is ultimately your responsibility

23 even if Rita is the conduit for the information.  That's all

24 I'm saying.

25 A.   Okay.

1  Q.  Okay?  Listed on the bankruptcy petition for Michael Paul

2  there are certain accounts receivable listing as 90 days old

3  or over 90 days old.  Where would the supporting documentation

4  for those accounts receivable be?

5  A.  In QuickBooks under that particular job.

6  Q.  And so it's very difficult for me to tell under the

7  particular job because Michael Paul was the umbrella and did

8  the management for several projects.  So when you look at this

9  petition and you're looking at Page 8 of 72, do you have any

10  recollection of what these receivables are reflected there,

11  one for $855,000 and one for approximately 3.6 million?

12  A.  It's all in QuickBooks.  If you want somebody to walk you

13  through it, I will be happy to do that.

14  Q.  Where --

15  A.  I have my accountant there as well if you want.

16  Q.  Okay.  And where is the 2015 GMC Savanna listed on the

17  petition?

18  A.  It is parked I believe at Katsura.

19  Q.  Okay.  Does it have plates on it?

20  A.  No.

21  Q.  You understand that nobody can be driving that vehicle,

22  correct?

23  A.  Nobody's driving it.

24  Q.  Okay.

25  A.  It's parked at the property.

1    MALE SPEAKER:  Is that the van?

2    MR. D'ALESSIO:  The van, yeah.

3  Q.  So on the Michael Paul bankruptcy there's listed a debt

4  to Cuddy & Feder LLP and it says legal fees for Katsura

5  Consultant Group.  Were those legal fees incurred in

6  connection with the purchase of your home?

7  A.  I have -- I don't recall.  I have no idea.

8  Q.  Well how about where would the correspondence with

9  respect to that invoice be?

10  A.  Under Cuddy & Feder under Katsura.

11  Q.  In the QuickBooks file?

12  A.  Correct.

13  Q.  Next there's a legal fee to Cutty & Feder for Beachwood 5

14  Associates LLC.  What is that related to?

15  A.  Another property with investors.

16  Q.  And where is that property located?

17  A.  In Purchase.

18  Q.  Is that property sold?

19  A.  We're trying to sell it.

20  Q.  That entity has not filed for bankruptcy?

21  A.  No, but there's a possibility we will be.

22  Q.  What is the address of the property?

23  A.  3030 Purchase Street.

24  Q.  And is there currently a contract of sale for that

25  property?

1    A.    No.

2    Q.    And is that Beachwood 5 Associates LLC?

3    A.    Correct.

4    Q.    And when was that property purchased?

5    A.    Approximately a year ago.

6    Q.    And how much was it purchased for?

7    A.    16 million maybe, 15, 16 million.

8    Q.    And what type of property is it?

9    A.    It was a two and a half --

10   Q.    Commercial?  Residential?

11   A.    -- two and a half acre residential estate property.

12   Q.    Did you knock down or --

13   A.    We knocked down the house and got it approved for a new

14   building.

15   Q.    Did you do a new building yet?

16   A.    No.

17   Q.    Who's the lender on that property?

18   A.    The investors hold a note on that property.  So it

19   structured a little different.

20   Q.    There's listed a GM financing lease.  What car is that?

21   There are two leases.  Which leases are those?

22   A.    They are probably the GMC Denalis.

23   Q.    Is that the Denali you're currently driving?

24   A.    No.  They were turned in to the dealer.

25   Q.    They are both returned to the dealer, is that correct?

1  A.    Yes.  All automobiles were returned to the dealers.

2  Q.    Showing you Page 23 of 72 of your petition.  There are

3  listed various trade debts, correct?

4  A.    Correct.

5  Q.    And this debt one is 41 Middle Pond Road Associates, 43

6  Middle Pond, 45 Middle Pond, Beachwood 5 Associates LLC.  How

7  did you determine in the daily operation of your business to

8  pay trade debt?  Was it always paid from Michael Paul

9  Enterprises LLC account or did the different LLCs have their

10  own bank account?

11  A.    It was normally paid from Michael Paul but it could be

12  paid from the entity as well.

13  Q.    And are there any agreements or documentation with

14  respect to it?

15  A.    There's normally contracts and they would all be under

16  the job.  You would have all of those.

17  Q.    So for instance, if there was a construction completed at

18  3 Sandpiper and you needed to pay an engineer, an architect,

19  or the HP guy, whatever you were doing, would that bill be

20  invoiced to Michael Paul or it would be invoiced to Sandpiper?

21  A.    Mostly all invoices were invoiced to Michael Paul.

22  Q.    Right.

23  A.    But soft costs were definitely paid out of the entity

24  checkbook because they were not a responsibility under the

25  Michael Paul contract.

1  Q.    Okay.  So for each of these properties there is a

2  contract with Michael Paul?

3  A.    Correct.

4  Q.    And define for us what a soft cost is versus --

5  A.    An engineer, an architect, engineers, architects,

6  surveyors, anything that's not a hard cost.

7  Q.    So those are soft costs and the soft costs were on

8  Michael Paul Enterprises?

9  A.    No.  They would bill -- everybody knew Michael Paul

10 Enterprises so they would bill Michael Paul Enterprises.  But

11 if it was a soft cost, it was the responsibility of the

12 entity.

13 Q.    So then --

14 A.    The entity would cut the check.

15 Q.    So tell me what the soft cost is again.  Which ones?

16 A.    The soft cost are architect, engineer, surveyor.

17 Q.    So when you had the soft costs, the entity would pay it,

18 correct?

19 A.    Yes.

20 Q.    So then when I look at your petition for Michael Paul and

21 the trade debt, it has debt to architects that are listed for

22 Michael Paul.

23 A.    Right.

24 Q.    For instance, for Beachwood which is a non-debtor, it's

25 listed as a trade debt of Michael Paul which would be

1  inconsistent with it being a soft cost and going to the entity

2  level.

3  A.    They don't know the entity.  So when you go through the

4  file you're going to find a contract with the architect from

5  Michael Paul, not from the entity.

6  Q.    Okay.  So you would book it --

7  A.    So legally --

8  Q.    -- as a debt of Michael Paul.  That would be the

9  contracting entity.  But the entity would owe it back to

10  Michael Paul?

11  A.    No.  A contract -- Michael Paul would sign a contract

12  with an architect.

13  Q.    Yes.

14  A.    The payment for that was the responsibility of the LLC.

15  The LLC would cut the check directly in most cases to

16  [indiscernible], to the architect.

17  Q.    Did the third party have any knowledge that the debt was

18  on behalf of the other LLC?

19  A.    I have no idea.

20  Q.    But the direct contract was Michael Paul, is that

21  correct?

22  A.    It was always Michael Paul because that's the company

23  they knew.

24  Q.    Okay.

25  A.    Otherwise they'd be dealing with 100 different companies.

1  Q.   And Rosenberg -- and it was easy to just have Michael

2  Paul receive all the bills, is that right?

3  A.   Exactly.

4  Q.   And so when the bills arrived, you know, even pursuant to

5  the mail forward, they're addressed to Michael Paul, correct?

6  A.   Correct.

7  Q.   What did Rosenberg & Estes PC do for Michael Paul?  What

8  did they represent?

9  A.   Various matters on the Manhattan stuff.

10 Q.   And be a little bit more specific than that.

11 A.   Like 67th Street, 64th Street, 62nd Street, 53rd Street.

12 All the entities that are in bankruptcy in Manhattan.

13 Q.   They represented all of them?

14 A.   In Manhattan, yeah.

15         MR. MANISCALCO:  53rd is not in bankruptcy, right?

16         MR. D'ALESSIO:  If it's not, it may be.  It's not

17 right now.

18 Q.   What is the --

19         MS. O'TOOLE:  I'm sorry, go ahead.

20         MR. MANISCALCO:  Do you plan on filing it as a

21 bankruptcy?

22         MR. D'ALESSIO:  I don't know.  I don't intend to if

23 I don't have to.  But if you tell me I have to, I will.

24         MR. MANISCALCO:  Who are the members of that entity?

25         MR. D'ALESSIO:  Same thing.  It's me.

1          MR. MANISCALCO:  You're a 100 percent member?

2          MR. D'ALESSIO:  I'm the managing member, yeah.  Am I

3   100 percent?  No because I have the investor group.  We have

4   investors.

5          MR. MANISCALCO:  Well, there's the LLC [inaudible]

6   the holding company.  Which one --

7          MR. D'ALESSIO:  So I'm probably 50 percent of that,

8   but I'm the managing member.

9   Q.    50 percent of the holding company or 50 percent of the

10  LLC that holds the fee?

11  A.    The fee?  I'm 50 percent of the fee and the investors are

12  50 percent of the fee.

13         MR. MANISCALCO:  And those documents are on the

14  drive?

15         MR. D'ALESSIO:  Yeah.

16         MS. O'TOOLE:  [Inaudible].

17         MR. MANISCALCO:  No.

18         MS. O'TOOLE:  Okay.

19  Q.    What is the breach of contract action against Grotto

20  Plumbing related to?

21  A.    They did plumbing work on prior jobs that have nothing to

22  do with any of this.  That was several years ago.  And they

23  breached their contract.

24  Q.    Is there a lawsuit?

25  A.    And we sued them, yeah.

1  Q.   And where is that lawsuit pending?

2  A.   It's pending.

3  Q.   Where?

4  A.   Westchester County.

5  Q.   So it's listed on the bankruptcy petition as a cause of

6  action against third parties on the Michael Paul Enterprises

7  petition.  Do you have reason to believe it's not an asset of

8  the Michael Paul bankruptcy?

9  A.   I believe it's going to be an onset of Michael Paul.

10 Q.   And who's the attorney representing Michael Paul in that

11 action currently?

12 A.   Ed Shapiro.

13 Q.   Okay.  And should you be contacted by any attorneys

14 representing anybody in connection with any of the lawsuits on

15 these LLCs you should direct them to me or my law firm.  I saw

16 that some attorney wrote a letter to --

17 A.   I think Ed did.

18 Q.   Well, he wrote a letter to a court.

19       MALE SPEAKER:  That's Ed.  That was Shapiro.

20       MS. O'TOOLE:  Yes.  Okay.

21 Q.   In the future though should they contact you, they should

22 first reach out to us --

23 A.   Okay.

24 Q.   -- so we can formulate our position --

25 A.   Okay.

Q.    -- because he doesn't necessarily have authority to act.
But he was just advising the court.  All right.  So I have a
lot.  I put -- I'm going to try to go through each of these as
best I'm able to.  East -- I'm on 145 East 62nd Street and
that's the holding LLC.  Did you have different accountants
representing different entities?

A.    No.

Q.    So I see on a couple of them Rifkin and Company has the
books and records.

A.    I'm sorry, I correct myself.  Rifkin did a few, maybe
three or four.

Q.    Okay.  And they understand that you filed for bankruptcy?

A.    Yes.

Q.    I'm showing you the 145-147 East 62nd Street Holding LLC
statement of financial affairs, question number one, gross
revenues.  Again, they are listed as unknown.  Why is it that
you could not ascertain the revenues of the entity?  Did it
have any?

A.    That's very minimal on that.

Q.    And what do you mean very minimal?

A.    Well, the rent roll is only, I don't know, I think 7,000
a month or so.

Q.    And where's this property located?

A.    62nd Street.

Q.    Did Holdings hold the fee?

1   A.   Associates holds the fee.

2   Q.   Right.

3   A.   Holding owns 50 percent of the fee.

4   Q.   Were the rents deposited into the holding company or into

5   Associates?

6   A.   Associates.

7   Q.   So did this entity have a bank account?  It did at

8   Greater Hudson Bank.

9   A.   I'm sure.  Yes.

10  Q.   And Signature Bank.  And you closed those accounts in or

11  about April 30, 2018?

12  A.   Yes.

13  Q.   And where did the proceeds go from those accounts?

14  A.   I don't recall.  Probably to the next bank that we were

15  using.

16  Q.   When you closed -- so for each of the affiliated debtors

17  that we're going through today, the accounts were closed in or

18  about April of 2018, is that right?

19  A.   Yes.

20  Q.   And you're saying you created accounts at a different

21  bank for each of the different entities?

22  A.   Correct.  What happened was after B&B, after the

23  experience with B&B where they swept all the money from the

24  accounts --

25  Q.   Yes.

1  A.    -- when we knew there was going to be an issue with a

2  particular property we moved the bank account so that it

3  wouldn't be swept.  And you'll have all those bank accounts on

4  QuickBooks.

5  Q.    And will I now have all of the money --

6  A.    Yes.

7  Q.    -- from those accounts?

8  A.    Yes.

9  Q.    Those checks were Federal Expressed to my office today?

10  A.    Yes.

11  Q.    And how much was sent to my office?

12  A.    I have no idea.

13  Q.    You have no idea?

14  A.    No idea.  I just signed them.

15  Q.    How many checks did you sign?

16  A.    I want to say three or four.

17  Q.    Okay.  I'm now at 184 East 64th Street Holdings and there

18  is listed non-business revenue on the statement of financial

19  affairs and there's a guarantee payment.  Do you see that

20  guarantee payment of $1.7 million?

21  A.    Yeah.  Which property is this?

22  Q.    This is --

23  A.    64th Street.

24  Q.    Yes.

25  A.    64th Street.

1  Q.    Holding LLC.

2  A.    Guaranteed payment, yes.

3  Q.    And what is that?

4  A.    Preferred return to the investors.  That means the

5  investors received $1.7 million in return.

6  Q.    And where did that revenue come from?

7  A.    Where did the --

8  Q.    So it would be correct to say --

9  A.    That's not revenue.  Isn't that expense?

10  Q.    I'm not going to answer your question, but Part 1 says

11  gross revenue and it says unknown as it says on each petition.

12  And then the second says non-business revenue and it says

13  guarantee payment.  Not surprisingly in 2017 it's unknown but

14  in 2016 there's 1.7 and that says include revenue regardless

15  of whether that revenue is taxable.  Non-business income may

16  include interest, dividends, money collected from lawsuits or

17  royalties.  And so this is listed as a receipt, not a

18  distribution on your return, I mean on your petition.  Do you

19  see that?

20  A.    It's a question I have to ask my accountant.

21  Q.    Okay.  Do you recall being paid on a guarantee and that

22  money went into holding?

23  A.    Which entity is that again?

24  Q.    This is 184 East 64th Street Holdings LLC.

25  A.    Okay.  So now I can explain.  So Associates pays Holding.

1  Holding would have received that money as a guarantee payer

2  and then disbursed it to all the investors.

3  Q.    So there --

4  A.    So it's an in and an out of that amount of money.

5  Q.    So there should be a money trail of money going from

6  Associates to Holdings and it's your testimony that money went

7  to the investors?

8  A.    Correct.

9  Q.    Were you one of the investors or any entity controlled by

10 you?

11 A.    I'm an investor in every project.

12 Q.    Right.  So would you have received some of those

13 distributions?

14 A.    Correct.

15 Q.    Were there -- is there any contemporaneous documents when

16 distributions were being made?  Any minutes, any notes?

17 A.    No.  Just checks.

18 Q.    And how would that happen?  Would you just say to Rita or

19 somebody --

20 A.    Cut the checks for the first of the month.

21 Q.    Okay.

22 A.    She cut them all.  I'd sign them all.  We'd send them

23 out.

24 Q.    Next is Bluestone 184 LLC.  That entity was formed in or

25 about 2015, is that correct?

1  A.   Correct.

2  Q.   And what was the nature of that business?

3  A.   That's the entity that holds my, substantially my portion

4  of -- Associates owns the fee.  Holding typically owns 50

5  percent of that entity.  The other 50 percent is owned by a

6  Bluestone entity which is me if you will.  Sometimes it's me

7  and a few other investors.

8  Q.   And that's how you receive your return on the

9  investments?

10  A.   It would go to Bluestone.

11  Q.   Well, just be careful.  There's more than one Bluestone.

12  It would go to Bluestone 184 LLC?

13  A.   Right.

14  Q.   Okay.  I'm showing you that petition, the statement of

15  financial affairs.  Again, I point you to question number one,

16  the gross revenues for 2016, 7.  For '16 it's indicated as

17  zero and for '17 and '18 it's listed as unknown.  Why is that?

18  A.   I can't answer that.  It's a question for the accountant.

19  Q.   Well --

20  A.   But there was probably no income.  There was no income on

21  that.

22  Q.   See, but in '16 you put zero and that would suggest none.

23  But in '17 and '18 you put unknown.  So is it zero or unknown?

24  A.   I can't answer that.

25  Q.   And you can't answer that because you have no

1  recollection whatsoever --

2  A.    I have no recollection.

3  Q.    -- or you want me to talk to the accountant?

4  A.    I have no recollection otherwise I would tell you.

5  Q.    Okay.

6  A.    It's really an accounting --

7  Q.    How in any given period of time did you predict your

8  ability to pay bills, your personal bills?

9  A.    I don't understand the question.

10 Q.    Well, each of these petitions indicate that your gross

11 revenues were unknown from any number of the entities, right?

12 Yes?

13 A.    Yes.

14 Q.    And so how did you know how much money you were going to

15 have in a given month for your personal expenses?

16 A.    I didn't but my expenses are sub -- are minimal.

17 Q.    Well, your current rents right now are like 12,000 a

18 month, aren't they, in the apartments that you have?

19 A.    That's minimal compared to the money I was making.

20 Q.    Okay.  But how do you know where you're going to get your

21 money to pay your rent?

22 A.    So I had my own portfolio with no investors --

23 Q.    Right.

24 A.    -- for over 20 years, 25 years.

25 Q.    And you know, I just did your personal 341 and where was

1  this -- what's in this portfolio?

2  A.   The only thing left right now is those three Tremont

3  properties.

4  Q.   Okay.

5  A.   That's it.

6  Q.   So where do you get the money to pay 12,000 a month in

7  rent?

8  A.   From those properties.

9  Q.   And that's the sole source of the money you have to pay

10 your rent?

11 A.   Well no.  Then I have contracting income from Michael

12 Paul.

13 Q.   Are you continuing to contract --

14 A.   No, no, no, no.

15       MALE SPEAKER:  [Inaudible].

16 A.   I'm talking prior to bankruptcy filing.  As of today I'm

17 on unemployment.  I'm not doing --

18 Q.   You are on unemployment?

19 A.   Yeah.  I'm doing nothing as of now.

20 Q.   So there is a difference between doing nothing and

21 actually receiving unemployment.

22 A.   I'm receiving unemployment.

23 Q.   And where are you receiving -- on behalf of which entity

24 are you receiving unemployment?

25 A.   Michael Paul.

Q.   Okay.  I didn't receive anything about your unemployment

in the mail forward.  Did you submit your paperwork for

unemployment?

A.   Yes.

Q.   Okay.  And when did you do that?

A.   A couple of weeks ago.

Q.   And what did you put down as your income when you sought

unemployment?

A.   I don't recall.  I'll give you a copy.

Q.   Okay.  I'm going to make demand for a copy of that.

Next, I'm turning to 184 East 64th Street Associates.

          MALE SPEAKER:  Did you do Holdings before?  Is that

what you did?

          MR. D'ALESSIO:  Yeah.

          MS. O'TOOLE:  Yes.

Q.   And the debt of 184 East 64th Street on the petition is

9.3 million, is that correct?

A.   If that's what's stated there, yes.

Q.   And I'm just going to go to the statement of financial

affairs.  Once again I'll point out to you question number

one, the income is listed as unknown, is that right?

A.   Correct.

Q.   And there is also listed there the 1.7 guarantee which we

just went through, so I did this one already.  Forgive me.

227 East 67th Street Associates, that building is an apartment

1  building, is that correct?

2  A.   Correct.

3  Q.   And it has tenants in it?

4  A.   It's actually a high-end condominium building and the

5  condos didn't sell.  So we had no choice but to rent it to try

6  to offset the expenses.  It doesn't carry itself.  It's six

7  units.

8  Q.   Okay.

9  A.   Very high end.

10 Q.   Right.

11       MR. MANISCALCO:  When you say condo building, that

12 means the condos have already been approved and deeds issued?

13       MR. D'ALESSIO:  No.  They were approved.

14       MR. MANISCALCO:  They were approved.  So --

15       MR. D'ALESSIO:  But we never sold any so it was

16 never -- you need to sell I think 15 percent of the building

17 to be effective.  We never got to that point.

18       MR. MANISCALCO:  So it never became effective?

19       MR. D'ALESSIO:  No.  But we did file the condo.  It

20 was approved.

21       MR. MANISCALCO:  So the fee ownership is still in

22 the Associates entity --

23       MR. D'ALESSIO:  Correct.

24       MR. MANISCALCO:  -- all six units, the entire

25 building?

1          MR. D'ALESSIO:  Correct.

2          MR. MANISCALCO:  Okay.  And when did it get

3   approved?

4          MR. D'ALESSIO:  Oh, I want to say about two years

5   ago.

6          MR. MANISCALCO:  So for the past two years you've

7   been renting it?

8          MR. D'ALESSIO:  Well, we tried to sell it first and

9   then when we got desperate we started to rent it.  I can't

10  tell you exactly one but I would say we probably rented it

11  maybe a year now, ten months, 11 months.

12         MR. MANISCALCO:  Is it listed for sale?

13         MR. D'ALESSIO:  It was listed for sale, yes.

14         MR. MANISCALCO:  For how much?

15         MR. D'ALESSIO:  I don't know the last number.

16         MR. MANISCALCO:  Can you give me an approximate

17  number?

18         MR. D'ALESSIO:  I believe the units were listed

19  between 4 and a half and 7 and a half.

20         MR. MANISCALCO:  Were you listing the units or were

21  you listing the building or both?

22         MR. D'ALESSIO:  We listed the units at first because

23  that's where the money was.  Then when we got desperate we

24  tried to list the building.  And then when we couldn't sell

25  anything, the office we were getting for the building didn't

1    even cover -- it was less than break even.

2          MR. MANISCALCO:  What was break even?  Do you have

3    an idea?

4          MR. D'ALESSIO:  It was like low 20 millions.  I

5    don't remember the number.

6          MR. MANISCALCO:  Lower than break even though?

7          MR. D'ALESSIO:  Yeah.  The last break even that I

8    remember was like 27 million.  Maybe now it's 28 million.

9          MR. MANISCALCO:  Now when you say break even, that's

10   what it cost you for this project?

11         MR. D'ALESSIO:  That's what it cost hard, soft,

12   everything.

13         MR. MANISCALCO:  Then would it be fair to say your

14   basis in this property is $27 million?

15         MR. D'ALESSIO:  Yep.  That's our basis but the

16   offers were substantially less than that.

17         MR. MANISCALCO:  This building has a first mortgage

18   on it?

19         MR. D'ALESSIO:  It has a first mortgage of 20

20   million with Preferred.

21         MR. MANISCALCO:  It's Preferred Bank?

22         MR. D'ALESSIO:  Yes.

23         MR. MANISCALCO:  That's all I have.

24         MS. O'TOOLE:  Okay.

25   Q.  Turning to the statement of financial affairs, part two,

1    it says list certain transfers made before the filing.

2    There's listed transfers in the year before the filing to

3    Michael Paul Enterprises care of Aspen of 422,000 or so.  And

4    it says payments on construction contracts.  Are there

5    documents that reflect those transfers?

6    A.    Can I see that?

7    Q.    Yes.

8    A.    What entity is this?

9    Q.    This is --

10                 MR. MANISCALCO:  227 --

11   Q.    -- 227 East 67th Street.

12   A.    There was a payment to Michael Paul.  It's on open

13   construction balance.

14   Q.    Is there an agreement that exists between Michael Paul

15   and that entity?

16   A.    Yes.

17   Q.    And where would that agreement be?

18   A.    On the hard drive.

19   Q.    And there's also next question number four, payments or

20   other transfers of property made within one year before this

21   case was filed.  Do you see that as well?

22   A.    Yes.

23   Q.    And then there's transfers to Michael D'Alessio of $3.8

24   million.

25   A.    Correct.

1   Q.    And they indicate loans and repayments of loans?

2   A.    Correct.

3   Q.    Are there any loan agreements with respect --

4   A.    No.

5   Q.    -- to those repayments?

6   A.    No.

7   Q.    How would you decide whether there would be a loan

8   repayment?

9   A.    You would see that I put in that money.

10  Q.    And --

11  A.    If you look at the ins and outs you'll see I put that

12  money in and then I reimbursed myself the money back.

13  Q.    Okay.  Remind me what date you sent the letter to your

14  creditors that you made every attempt but it wasn't going to

15  work out?  Is that in or about February of 2018?

16  A.    I don't recall.  You have a copy of --

17  Q.    Do you remember when the TRO was entered in the case?

18  A.    I don't.

19  Q.    Was that in March of 2018?

20        MALE SPEAKER:  April.

21        MS. O'TOOLE:  April?

22        MALE SPEAKER:  March?

23        MS. KIRBY:  28th.

24        MALE SPEAKER:  March 28th.

25  Q.    And so I see that there are transfers to Michael Paul

1  Enterprises and to Michael D'Alessio occurring in February, in

2  April, and then [inaudible] May.  Did you make distributions

3  to Michael Paul Enterprises and to yourself after you advised

4  creditors there were insufficient funds to make payments to

5  them?

6  A.    I don't recall.  I don't know.

7  Q.    Well, do you have any doubt?  If you look at the dates on

8  the petition -- did you assist in preparing this schedule of

9  payments?

10 A.    According to this, this was all done before the TRO.

11 Q.    But it wasn't done before you sent the letter to the

12 investors, is that correct?  At this point --

13 A.    I don't have a letter, so but --

14 Q.    Okay.  All right.  And your testimony is that the only

15 way to follow these is to look at book entries?

16 A.    Correct.

17 Q.    And how did you come out with the dates that amassed or

18 equal 3.8 million?  What did you look at?  QuickBooks?

19 A.    Yeah.  If you look at QuickBooks under those dates you'll

20 see entries.

21 Q.    Is there -- was there an Excel spreadsheet or anything

22 created --

23 A.    No.  QuickBooks.

24 Q.    -- as to the amounts?

25 A.    QuickBooks.

1  Q.    Okay.  So if somebody just did a search for all payments

2  to you within that entity?

3  A.    Correct.

4  Q.    Okay.  And the Aspen Management [inaudible] East 67th

5  Street, is there a contract with Aspen Management to manage

6  that property or any property?

7  A.    There's no contracts with Aspen.

8  Q.    And that's because you owned the entity up until a few

9  months before filing?

10 A.    Correct.

11 Q.    All right.  And what was the monthly amount that was paid

12 to Aspen?

13 A.    I have no idea.

14 Q.    Where would one confirm the amount that Aspen was to be

15 paid?

16 A.    In QuickBooks.

17 Q.    Okay.  So that's the amount that was paid but was there a

18 fixed amount -- it was paying for the services that was

19 rendered.

20 A.    It's a percentage of rent roll.  I don't know the

21 percent.  It might be 5 percent, 7 percent.

22 Q.    And is there an agreement somewhere that said --

23 A.    There's no --

24 Q.    -- Aspen was -- so --

25 A.    There's no Aspen agreements.

1  Q.    -- other than your head, how would somebody know the
2  percentage that Aspen would receive?
3  A.    Because the office knew that with all -- anything that
4  Aspen managed it was X percent, whether it's 5 percent or 7
5  percent of the rent roll is the management fee.
6  Q.    And who in the office would know that?
7  A.    Rita.
8  Q.    She knew the percentage?
9  A.    Correct.
10 Q.    But there was no document reflecting it?
11 A.    No.
12 Q.    And she would simply reconcile the books and decide --
13 A.    It's a recurring check every month to memorize the
14 transaction.
15 Q.    Right.  And so it exists purely in somebody's head,
16 correct?
17 A.    No.  It's in QuickBooks.  If you go to pay your bills at
18 the 1st of the month and you go into memorized transactions you
19 know what you have --
20 Q.    Oh, I see what you're saying.  QuickBooks has memorized
21 it but it's a percentage.
22 A.    Exactly.
23 Q.    But it's not written down anywhere?
24 A.    No.
25 Q.    And it's based on the rent roll?

1  A.    Yes.

2  Q.    Is it based entirely on the rent roll?

3  A.    Yes.

4  Q.    And did Aspen also manage the building at 145-147 62nd

5  Street?

6  A.    It managed it but somehow I was just informed yesterday

7  that we never took a fee on it.

8  Q.    Okay.  And --

9  A.    It just slipped through the cracks.  I don't know what

10 happened.

11 Q.    Well, it's a rent stabilized building?

12 A.    Yeah.

13 Q.    Are those units rent stabilized?

14 A.    Yes.

15 Q.    Is that what they are?

16 A.    Yes.

17 Q.    And are those tenants current on paying their rent?

18 A.    I don't know but probably.  It would be a wonderful thing

19 if they were but I assume --

20        MALE SPEAKER:  But I think [inaudible] yesterday.

21 A.    I think they're current.

22 Q.    It's rent stabilized, not rent controlled, is that

23 correct?

24 A.    Stabilized.

25 Q.    Okay.

1          MR. LEIBOWITZ:  When you say we didn't take a fee,

2     do you mean a management fee?

3          MR. D'ALESSIO:  Yeah.

4          MS. O'TOOLE:  And that's Aspen.

5          MR. LEIBOWITZ:  On 62nd.

6          MS. O'TOOLE:  That's 62nd, correct.

7          MR. LEIBOWITZ:  Thank you.

8          MS. O'TOOLE:  And just for the clarity of the record

9     that was Jason Leibowitz that was speaking.

10          MR. D'ALESSIO:  And who do you represent?

11          MS. O'TOOLE:  Maverick, right?

12          MR. LEIBOWITZ:  Yeah.  And 145 East 62nd Street.

13    Q.   And then in or about April of 2018 the Greater Hudson

14    account was zeroed out as well --

15    A.   Yes.

16    Q.   -- for this entity?  And again, we should be able to see

17    that zero out or transfer of the funds to a new account?

18    A.   Correct.

19    Q.   Where were the new accounts maintained?  What bank?

20    A.   I don't know.  We used several banks.

21    Q.   Well, so it's imperative that you identify where you

22    moved the monies.  I need to know.  It's a global thing.  If

23    you want to point me in the direction, but we need to know any

24    and all bank -- where any and all the debtor's monies are

25    located.

1  A.   I have no problem meeting with whoever you want me to

2  meet with to walk them through this.

3  Q.   I do appreciate that but your testimony is important too.

4  So to the extent that you have any recollection of the

5  information you should attempt to let us know.

6  A.   I am.  I just, I don't --

7  Q.   Okay.  I'm just trying to make some judicious decisions

8  because we are pressed for time.  Now I'm turning to 145-147

9  East 62nd Street Association and as mentioned, this is the rent

10 stabilized building.

11 A.   Correct.

12 Q.   There are six tenants.

13 A.   Yes.

14 Q.   And one commercial portion of the building is not

15 occupied, is that correct?

16 A.   Correct.

17         MS. O'TOOLE:  And I'm going to [inaudible].

18         MR. MANISCALCO:  Yeah.  How much is invested in that

19 building.  What is your basis?

20         MR. D'ALESSIO:  I have no idea.

21         MR. MANISCALCO:  Did [inaudible] pay for it?

22         MR. D'ALESSIO:  Paid I want to say between 5 and $6

23 million.

24         MR. MANISCALCO:  When did you do that?

25         MR. D'ALESSIO:  Approximately two years ago.

1          MR. MANISCALCO:  Do any improvements to it?

2          MR. D'ALESSIO:  We started, yes.  We took over one

3     apartment, one rent stabilized apartment and downloaded.  We

4     took -- we vacated the two commercial tenants that were there

5     and downloaded that.

6          MR. MANISCALCO:  Estimate the amount of capital

7     improvements you put in there.  How much did you put in?

8          MR. D'ALESSIO:  I have no idea.

9          MR. MANISCALCO:  Where can I get that?

10          MR. D'ALESSIO:  On QuickBooks.

11          MR. MANISCALCO:  Did you file tax returns for this

12     entity for 2017 or 2016?  Do you know?

13          MR. D'ALESSIO:  I don't think so.  I think we're on

14     extension.

15          MR. MANISCALCO:  For '17?

16          MR. D'ALESSIO:  I don't know about '16.

17     Q.    Did any of these entities file consolidated tax returns?

18     A.    No.

19     Q.    Or did they all file their own individual returns?

20     A.    All individual.

21     Q.    And are they all on extension for 2017?

22     A.    Correct.

23     Q.    And when I say all, the affiliated debtors that we

24     discussed.

25     A.    Everything is on extension.

1  Q.    Okay.  So if anything, the last returns that were filed

2  were 2016 and some of those --

3  A.    I think '15, right?

4  Q.    Okay.  So you haven't filed '16 either?

5  A.    I don't think so.  I think '16 is on --

6          MR. MANISCALCO:  '16 can't be on extension.  '16

7  would be late.

8          MR. D'ALESSIO:  So then '16 was done, '17 is on

9  extension.

10          MR. MANISCALCO:  '17 would have been due March 31st.

11          MR. D'ALESSIO:  And I think the extension is October

12  or September.

13          MR. MANISCALCO:  Okay.

14          MR. D'ALESSIO:  Which is an aside I want to just

15  bring up.  We get a lot of phone calls from the investors

16  about the tax information and we don't know what to do.

17          MR. MANISCALCO:  Was it the same accountant for all

18  these?

19          MR. D'ALESSIO:  Yes.

20  Q.    Well, that's not exactly true because Rifkin was the

21  accountant on certain --

22  A.    He did like three of them.

23  Q.    And [inaudible] was the accountant on others.  So --

24  A.    The PC is going to be doing everything now.

25          MR. MANISCALCO:  So the PC was the accountant for

1  all these entities except Rifkin --

2          MR. D'ALESSIO:  Did like three of them.

3  Q.   And how do you know the PC?

4  A.   He's my accountant for 30 years.

5  Q.   And how did you first meet him?  Did you go to school

6  with him?

7  A.   No.

8  Q.   Did you grow up with him?

9  A.   I met him through another builder.

10  Q.   Okay.  Turning now [inaudible] 145-147 East 62nd Street

11  Associates statement of financial affairs, question number 30

12  for payments to the insiders.  There are some payments that

13  were made to you including as recently as May 9th.  How was it

14  determined that those payments would be made to you?

15  A.   I have no idea.

16  Q.   Well, Rita doesn't sit down and say today I'm going to

17  write a check to Mike for some amount of money.

18  A.   She goes in QuickBooks monthly.

19  Q.   Yes.

20  A.   And if there's money due --

21  Q.   And how would one decide if money is due?  Do you have an

22  agreement or something that you're supposed to get money out

23  of the rent stabilized building?

24  A.   This is a reimbursement of loans and this is a payment

25  for a service call.

1  Q.   Okay.  But what -- right.  It says loans working capital.

2  Right.  That's the basis for why you receive the money?

3  A.   Because I lent them the money.

4  Q.   How does somebody know there's a loan or money given for

5  working capital?

6  A.   Because when they lend money from the account, from the

7  funding account, they make a memo in QuickBooks.

8  Q.   And do you get paid back right away, do you get paid back

9  in 60 days?

10  A.   As soon as I can get paid back.  I mean the instruction

11  is --

12  Q.   So you loaned your personal money?

13  A.   To all of these entities.  I loaned my personal money to

14  every single entity.

15  Q.   And then you paid yourself back?

16  A.   Exactly.

17  Q.   Okay.  Do you gamble?

18  A.   I have on occasion.

19  Q.   But do you gamble?  Do you gamble large amounts of money?

20  A.   I have on occasion.

21  Q.   The money that we discussed, and I'm sure you know it was

22  filed in court papers, at the Bellagio, did you gamble that

23  money?

24          MALE SPEAKER:  Gambled [inaudible] --

25  Q.   Is that where you're gambling?

1   A.    Yes.

2   Q.    All right.  How often do you go to the casino?

3   A.    Once a month.

4   Q.    And where do you go to the casino?

5   A.    I go to -- not Bellagio.  The one that's on the paper.  I

6   forget the name of it.  In Atlantic City.

7   Q.    On the what?

8   A.    On the filings.

9           MALE SPEAKER:  The schedules.

10  A.    On the schedule.

11  Q.    Okay.  But when you go to a casino are you gambling?

12  A.    Sometimes.

13  Q.    But not always?

14  A.    No.

15  Q.    What is the largest amount of money that you put on a bet

16  at a casino?

17  A.    A couple of hundred dollars.

18  Q.    Couple of hundred?

19  A.    Yeah.

20  Q.    Not a hundred thousand, right?

21  A.    No.

22  Q.    Right.  And have you lost?  What's the largest amount of

23  money you've lost at a casino?

24  A.    A couple of hundred thousand.

25  Q.    A couple of hundred thousand?

1  A.    Yeah.  I've also --

2  Q.    And when was that?

3  A.    I've also won several hundred thousand.

4  Q.    The property --

5         MR. ROSEN:  She asked you -- can I ask him

6  something?

7         MS. O'TOOLE:  Sure.  But for the record, Sandy Rosen

8  speaking.

9         MR. ROSEN:  The trustee asked you did you ever loan

10 your money to these entities and having been paid back.  Were

11 you fully paid back?

12        MR. D'ALESSIO:  No.  Just for the record, I borrowed

13 over $13 million personally on my name on my portfolio that

14 went into these projects.

15 Q.    I'm your personal trustee.  I get --

16 A.    I just want to put it on the record.

17 Q.    -- that you have debts.

18 A.    I just want to put it on the record.

19 Q.    Okay.  And for the purposes of bankruptcy --

20 A.    And as far as gambling, I have never gambled with anybody

21 else's money, any investor money.  Okay?  I make or made a

22 substantial income and the amount of money I gambled was

23 minimal compared to the kind of money I made.

24 Q.    I make -- I don't even know that --

25 A.    Just for the record.

1  Q.    -- you do gamble.

2  A.    Just for the record.

3  Q.    It's not -- it's a different question that I'm asking.

4  The property -- I'm going to start -- stop going through the

5  entities a little bit and try to focus on some properties.  I

6  want to ask you about 1517 Circle Road in Scarsdale.  Which

7  entity owes the fee in that just for brevity here?

8  A.    There's two entities.  They each own the fee.  15 owns

9  15, 17 owns 17.

10 Q.    Okay.  And which one has the partially built house on it?

11 A.    I believe 17 is the one that is substantially complete.

12 Q.    Okay.  And when you say substantially completed, it's

13 hard to put a percentage on it, but do you have a sense?

14 A.    80 something.

15 Q.    Okay.  Does it have air condition and duct work in the

16 house?

17 A.    Yes.

18 Q.    Does it have drywall up in the rooms?

19 A.    Yes.

20 Q.    Are the walls painted?

21 A.    No.

22 Q.    Is the kitchen in?

23 A.    Ordered.

24 Q.    How about plumbing?

25 A.    All in.

1  Q.   Bathrooms completed?

2  A.   No.

3  Q.   Okay.

4  A.   Finishes aren't completed.

5  Q.   What did you purchase that property for?

6  A.   I don't recall the amounts but I believe it was in the

7  neighborhood of a million one to a million two per lot.

8  Q.   And what's the current debt on the property?  Secured

9  debt.

10  A.   I don't know.

11  Q.   About 800,000 or so?

12  A.   No, I think it's more than that.

13  Q.   You do?  Okay.  And then the other property, the vacant

14  lot next door, is --

15  A.   We improved it.

16  Q.   The foundation hasn't been poured, right?

17  A.   We removed the rock, we put up the retaining wall, and we

18  installed the sewer.

19  Q.   Okay.

20        MR. MANISCALCO:  This is 15?

21        MR. D'ALESSIO:  On 15.

22  Q.   And on 15 that retaining wall, was that approved by

23  Scarsdale or the town or anything?

24  A.   Yes.

25  Q.   It was.  Okay.

1  A.    They asked us to put it up first.

2  Q.    Okay.  The foundation is dug but nothing's poured, right?

3  A.    No.

4  Q.    And then the blocks are there to do it?

5  A.    No.  It would be poured concrete.

6  Q.    There are big cement -- do you know what those are?

7  A.    That's leftovers from the retaining wall.

8  Q.    Oh, okay.  All right.

9  A.    And just for the record on this project, this was a

10  project that was moving full steam ahead and would have been

11  sold and the investors would have got all their money back and

12  made money if it wasn't for a lawsuit by a couple of the

13  investors.

14  Q.    And did you have a prospective purchaser?

15  A.    No.

16  Q.    Did you have an estimated price on resale of that home?

17  A.    Yes.

18  Q.    And what was that?

19  A.    I believe 3.3 or 3.4.

20  Q.    It was finished?

21  A.    Finished.

22  Q.    And that is in the Scarsdale school district?

23  A.    Yes.  The best one in Scarsdale.

24  Q.    Elementary wise you're saying?

25  A.    I think it's one of the best ones.

1  Q.    And then the second -- was there -- you knocked down the

2  house on 13?

3  A.    No.  We bought the property.  The house was already

4  knocked down and subdivided into two lots.

5  Q.    Okay.  So had another builder attempted to --

6  A.    Yes.

7  Q.    -- do that but unsuccessfully?

8  A.    Yes.

9  Q.    And then what did you anticipate you could sell the other

10 home for?  About the same 3.3?

11 A.    Same thing.  Like 100,000 less.

12 Q.    And what did you purchase, I may have asked, but 15 for?

13 A.    Like a million one, million two per lot.

14 Q.    Even with the knockdown?  So was knockdown already -- 15

15 was knocked down already?

16 A.    There was -- we didn't do any demolition.

17 Q.    Nothing on either.

18 A.    We didn't do -- the demolition was done before us.  So we

19 had vacant land.

20 Q.    So you purchased -- both were vacant lots?

21 A.    Both were vacant lots, two separate --

22 Q.    And you purchased them each for one one.  And you --

23 A.    One one or one two.  I don't remember the number.

24 Q.    And then you thought you could build and net about 2

25 million?

1  A.    Right.

2  Q.    How much have you invested or put into building 17?

3  A.    I have no idea.

4  Q.    And the documents with respect to that are going to be

5  reflected in QuickBooks?

6  A.    Absolutely.

7  Q.    Now, part of my problem, assuming I have QuickBooks or

8  can access it or eventually will get it, not assuming I will -

9  -

10  A.    You will.

11  Q.    I know I will.  How do we look at the -- we're trying to

12  get to the basis of the property and what it cost to build

13  there, right?  Is that going to be under Michael Paul

14  Enterprises or is that going to be under 15 or 17?  So how do

15  I break out your soft and your hard?

16  A.    So you're going to take both.  The soft is going to

17  appear on the LLC.

18  Q.    Okay.

19  A.    The fee LLC is going to have the soft.

20  Q.    Yes.

21  A.    And the hard is a fixed number.  We always signed a

22  contract so there wouldn't be a conflict of interest.  We

23  always signed a contract between -- for an agreed price for

24  construction.

25  Q.    So it's an agreed price and not a percentage on the

1  construction.

2  A.   It was agreed price.

3  Q.   And do you know what your agreed price for the

4  construction of --

5  A.   I don't.

6  Q.   Was Michael Paul paid for that construction, any portion

7  of it?

8  A.   I'm sure they were.  I don't know the amount.

9  Q.   Okay.  So next I want to move to 227 East -- we did that

10 one.  All right.  4143 --

11         MR. MANISCALCO:  Middle Road.  Right.

12         MR. D'ALESSIO:  And 45.

13         MS. O'TOOLE:  Right.

14         MR. MANISCALCO:  And what about 38?

15         MR. D'ALESSIO:  39.  39 just do separately.

16 Q.   We should do it separately?

17 A.   Yeah.

18 Q.   Right.

19 A.   Talk about 41, 43, 45.

20 Q.   Okay.

21 A.   They're all vacant, approved building lots.

22 Q.   Were they that when you purchased them?

23 A.   No.

24 Q.   And what did you purchase 41, 43, and 45 for?

25 A.   I have no idea.

1  Q.   And what was the impediment to building them?

2  A.   Yes.

3  Q.   The bankruptcy or the other lawsuit?

4  A.   The impediment was the lawsuit.

5        MR. MANISCALCO:  When did you start building 39?

6        MR. D'ALESSIO:  39 I built last year.  It's about

7  one year old.  If you want to talk about 39, 39 is completed.

8  Q.   Had you begun to market and sell that or what --

9  A.   We had it up for I think 4.9.

10 Q.   Was there a listing you did?

11 A.   Yes.

12 Q.   And who's that with?

13 A.   Nest Seekers.

14 Q.   Did you receive any offers?

15 A.   We constantly received offers.  We were holding out

16 because we felt we could get more money.  And then

17 unfortunately, once we started with the subdivision, it became

18 harder to sell the house.  Anybody with foresight doesn't

19 really want to be --

20 Q.   On top of their neighbor.

21 A.   You know, for two years with construction around them.

22 Because the way it is it's 39, you're surrounded by the vacant

23 lots.

24 Q.   Yes.  Okay.

25 A.   So what happened is we had trouble selling because of the

1 global project.

2 Q.   Is that still listed?

3 A.   No.  I didn't renew the listing.

4 Q.   Okay.  And then let's go through 41, 43, and 45.  Those

5 are vacant but they're approved to go?

6 A.   Vacant approved.

7 Q.   Okay.  How about 3 Sandpiper?

8 A.   Vacant and approved.

9        MR. MANISCALCO:  There's nothing on Sandpiper at

10 all?

11        MR. D'ALESSIO:  No.  We took the old house down and

12 got the new house approved.

13 Q.   What was that one, what was that property purchased for?

14 A.   I want to say one seven, one eight.

15 Q.   And that was with the house on it though?

16 A.   Yeah.

17 Q.   Okay.

18 A.   That's on the water.

19        MR. MANISCALCO:  Is it deep water?

20        MR. D'ALESSIO:  Yeah.  Deep enough.  There's a boat

21 there.

22        MS. O'TOOLE:  Well, I know other people are here.

23 We have limited, really limited opportunity.  I know I can

24 speak to Mr. [indiscernible], and we will with respect to the

25 QuickBooks and Rita.  I have about 25 minutes and then we have

1  a hard stop because we have to get on a court call for another

2  case where the judge scheduled it today.  So does anybody have

3  any questions they'd like to ask?  We have an attorney in the

4  back here.  Just note your name again for the record.

5          MR. MANISCALCO:  Speak loudly [inaudible].

6          MS. KIRBY:  All right.  I'll pull up another chair.

7  BY MS. KIRBY:

8  Q.    dawn Kirby, DelBello Donnellan representing Attis

9  Properties.  I'm going to limit my questions just to entities

10 that you listed in your personal petition that seem to be

11 related to these debtors that we're talking about today that

12 are not filed into bankruptcy.  So on your petition -- I'll

13 start with the debtor 145-147 East 62nd Street.  There are two

14 debtors, one's Holding one's Associates.  And the personal --

15 A.    I'm sorry, which debtors?

16 Q.    145-147 East 62nd Street.

17 A.    Okay.

18 Q.    Okay?  In your personal petition you indicate that you

19 have ownership interest in Bluestone 145-147 LLC and Blue 145

20 E 62 LLC, and FCP 145 Holding LLC.  You testified earlier that

21 the Bluestone entities are generally your entity that owns 2

22 percent of Associates, correct?

23 A.    Correct.

24 Q.    So Bluestone 145-147 LLC, is that related to this project

25 and the debtor that I just mentioned?

1  A.    Yeah, I believe so.

2  Q.    And what about Bluestone 145 E 62 LLC?

3  A.    I believe so.

4  Q.    And what about FCP 145 Holding LLC?

5  A.    I believe so but I'm not sure about that.

6  Q.    Do those entities have bank accounts?

7  A.    Yes.

8  Q.    Do they have any money in the bank accounts?

9  A.    I have no idea.

10 Q.    Do they have any other assets other than their bank

11 account?

12 A.    No.

13 Q.    Why aren't they in bankruptcy?

14 A.    I don't know.  Maybe we'll put them in bankruptcy.  I

15 don't know.  I don't know the answer to that.

16 Q.    You don't know.  Okay.  Similar question for 163-165 East

17 62nd -- let me go back.  Where is the bank account located --

18         MR. D'ALESSIO:  Sandy, can you make a note of her

19 last question which is a good question?  Why aren't those

20 entities in bankruptcy?

21         MR. ROSEN:  Which one?

22         MS. KIRBY:  The two Bluestone entities that are on

23 his individual petition as being entities he has interest in -

24 -

25         MR. D'ALESSIO:  They should be.

1    MS. KIRBY:  -- that are related to the 145-147 East
2  62nd.

3    MS. O'TOOLE:  I don't mean to interrupt you.  Can I
4  just ask a clarifying question?

5    MR. D'ALESSIO:  Sure.

6    MS. O'TOOLE:  Generally when you had a deal, did you
7  set up an entity for yourself called Bluestone?

8    MR. D'ALESSIO:  Yes.

9    MS. O'TOOLE:  Is that how you held your interest in
10  most of them?

11    MR. D'ALESSIO:  Yes.

12    MS. O'TOOLE:  Okay.  Thank you.

13  Q.  Do you know what bank the bank accounts are for Bluestone
14  145, those entities?

15  A.  I don't.

16  Q.  Similar question for 163-165 East 62nd Street.  They're
17  two entities in bankruptcy.

18    MR. D'ALESSIO:  [Inaudible].

19    MR. ROSEN:  [Inaudible].

20    MR. D'ALESSIO:  No, this one here.

21    MR. ROSEN:  I'm going to do it.  She has to speak
22  first.

23  Q.  There are two entities that are listed in your personal
24  that I'm going to ask are they related to the same projects
25  but they're not debtors.  One is called 161-167 East 62nd

1　Street Holding LLC and the other is Bluestone 161-167 LLC.

2　Are those related to the debtors 163-165?

3　A.　I don't know.　They may be or they may be entities we

4　didn't use.　If they are entities that are involved, they

5　should be filed in -- they should file bankruptcy.

6　Q.　Okay.

7　　　　　　MR. ROSEN:　Not necessarily.

8　Q.　Well, we won't -- we'll let your counsel talk to you

9　about that.　Similar question on 41-45 Middle Pond Road.

10　They're two entities on your personal that are not debtors.

11　One is Bluestone 42-45 LLC and the other is 41-43 Middle Pond

12　Road Holding LLC.　Do those -- are those related to the same

13　project?

14　A.　They should be.

15　Q.　And is there a reason they're not in bankruptcy?

16　A.　I don't know.

17　Q.　Do you know if they have assets or bank accounts?

18　A.　They don't have any assets.

19　Q.　Do they have bank accounts that are open even if it has

20　zero in it?

21　A.　They may.

22　Q.　You're not sure though?

23　A.　No.

24　Q.　Right.　So would there be QuickBook --

25　A.　Yes, absolutely.

1  Q.   -- QuickBook entries regarding --

2  A.   Absolutely.

3  Q.   -- all of these entities that I'm asking about.

4  A.   You have to understand on the Middle Pond Road projects

5  most likely there was no money in the checkbook because there

6  was -- we never did the full raise, we never did the full

7  raise --

8  Q.   You mean from investors?

9  A.   From investors.  There was no money coming in.  There was

10  only money owing out.  And I was funding.

11  Q.   Okay.  So you used the investor money for the project --

12  A.   Right.

13  Q.   -- plus put some of your own in?

14  A.   Right.  So most likely -- I'm sure everything has a bank

15  account but I couldn't tell you how much or what --

16  Q.   [Inaudible] --

17  A.   But if it did it would [inaudible].

18  Q.   Okay.  And then just a similar question for 227 East 67th

19  Street.  There are two debtors in bankruptcy, Holding and

20  Associates.  And then you indicated your Bluestone 67 LLC.  I

21  presume that's probably your entity that owned 50 percent of

22  Associates.

23  A.   Correct.

24  Q.   I'll just, for the record, ask the same question.  Does

25  it have a bank account?

1  A.   It definitely has a bank account.

2  Q.   Do you know if there's any money in the bank account?

3  A.   There's probably no money in it.  If there is, it's

4  minimal.

5  Q.   When's the last time it had money in it?

6  A.   I have no idea.

7          MR. MANISCALCO:  Do all the Bluestone entities use

8  the same banking institution?

9          MR. D'ALESSIO:  Yes.

10          MR. MANISCALCO:  Do you know what that is?

11          MR. D'ALESSIO:  No, because what happened is as we

12  had issues with banks going through these difficulties and

13  they were shutting us down, we had to move accounts.  Today I

14  don't know.  I can't answer what the status is.

15  Q.   Did you move the accounts to like small local banks as

16  opposed to Chase, Citibank, HSBC, that sort of thing?

17  A.   Yeah, they're all small banks for the most part.

18          MS. KIRBY:  We have a 2004 exam so I was going to

19  ask questions about other projects but these all just related

20  to the debtors.

21          MR. ROSEN:  Have you scheduled that yet?

22          MS. KIRBY:  Sorry?

23          MR. ROSEN:  Have you scheduled that yet?

24          MS. KIRBY:  No, not yet.

25          MS. O'TOOLE:  I was just going to say I don't think

1   we saw that order either but it --

2           MR. MANISCALCO:  It's not in yet.

3           MS. KIRBY:  No, I haven't -- I'm about to --

4           MS. O'TOOLE:  [Inaudible].

5           MS. KIRBY:  Yes.

6   BY MS. O'TOOLE:

7   Q.    Okay.  Have you, in the last year, have any other

8   projects, have you sold any property whatsoever?

9   A.    In the last year?

10  Q.    Yes.  Any project that you've been involved in directly

11  or indirectly through any entity.  Have you sold any

12  properties?

13  A.    Yes.

14  Q.    And where were those properties sold?

15  A.    2500 St. Peter's or St. Raymond's Avenue.

16  Q.    In the Bronx?

17  A.    Yeah.

18          MR. MANISCALCO:  Which was it, St. Raymond's or St.

19  Peter's?

20          MR. D'ALESSIO:  It's on the corner.  2500 St.

21  Raymond's.

22          MR. MANISCALCO:  Do you remember the date it sold?

23          MR. D'ALESSIO:  No.

24  Q.    And what was it sold for?

25  A.    I have no idea.

1  Q.   And what was the entity that held the fee?

2  A.   Something relating to the name.  Probably something like

3  2500 St. Raymond's Associates.

4  Q.   And was there also a Bluestone --

5  A.   No.

6  Q.   -- entity in that?

7  A.   No.

8  Q.   Did you --

9  A.   There was no investors in that project.

10 Q.   And did you receive any money as a result of that sale?

11 A.   I believe there was a couple of hundred thousand after

12 closing.

13 Q.   And where was that money deposited?

14 A.   Into one of my accounts.

15 Q.   And what account was that?

16 A.   I have no idea.

17 Q.   And when was that sold?

18 A.   I don't recall the date but within the last year.

19 Q.   And where would I find -- how would I follow that money?

20 A.   If you pull up that project on the hard drive you'll have

21 the closing statement and deed and everything.

22 Q.   Will it say where the money was deposited though?

23 A.   That would be in QuickBooks.

24 Q.   And that would reflect deposits for you personally?

25 A.   Yeah.

1   Q.   Okay.  And what did you do with that couple of hundred

2   thousand?

3   A.   Used it for living.

4   Q.   And do you have any idea when the sale was, summer,

5   winter, spring, fall?

6   A.   I have no idea.

7   Q.   Did you sell any other property or give any other deeds

8   in lieu of foreclosure?

9   A.   Yes.  61, 163, 165, 167 East 62nd Street.

10  Q.   And who was the lender --

11              MR. MANISCALCO:  East 67th or 2nd?

12              MR. D'ALESSIO:  62nd.

13              MR. MANISCALCO:  Six two.

14  Q.   And you said 61, 163 --

15  A.   Yeah.  161 --

16  Q.   Oh, okay.

17  A.   163, 165 -- no, I'm sorry.  It's 163, 165, 167 East 62.

18  Q.   Okay.  And what did you do?  Was that a sale or a deed in

19  lieu?

20  A.   Just gave a deed in lieu.

21  Q.   Who was the lender?

22  A.   The lender, I don't recall the lender at the end because

23  they sold the note as soon as we had problems.

24  Q.   Were you represented by counsel?

25  A.   Yes.

1  Q.   What counsel represented you?

2  A.   Jonathan Hacker [Ph.].

3  Q.   And did you receive any cash out on the deed in lieu?

4  A.   Yes, I did.

5  Q.   How much did you receive?

6  A.   I think it was about 600,000.

7  Q.   And did that money go to you individually or to an entity

8  controlled by you directly or indirectly?

9  A.   I don't recall.  It ultimately came back to me though.

10  Q.   And was that in the last year?

11  A.   Yes.

12  Q.   So in the last year you received 600,000 or so from this

13  deed in lieu and then you also received a couple of hundred

14  thousand from 2500 St. Raymond's Avenue?

15  A.   Correct.

16  Q.   You're going to have to account for where that money went

17  and how it was spent.

18  A.   Sure.

19  Q.   Any other sales or deeds in lieu in the year before you

20  filed?

21  A.   I don't believe so.

22  Q.   Have you transferred any money abroad?

23  A.   No.

24  Q.   Any entity controlled directly or indirectly by you have

25  accounts abroad?

1  A.    No.

2          MS. O'TOOLE:  All right.  Anybody else have --

3          MR. D'ALESSIO:  For the record, neither I or any

4  entity that I'm involved with, there is no money in the states

5  or abroad.  I know the investors have this theory that there's

6  got to be money, but there is no money.

7  Q.    So dispel the myth, right?  So how are you -- one might

8  say somebody would get a $2,000 a month apartment if they had

9  absolutely no money.  But you're staying in an apartment that

10 costs 12,000 a month?  Or you're --

11 A.    No, no, no --

12 Q.    No, no, you have one in Florida and one in New York in

13 total.

14 A.    And I'm getting rid of the one in Florida.

15 Q.    Okay.  And how are you paying that?  Does your brother

16 help you?

17 A.    My brother --

18 Q.    Does your father help you?  Where's the money --

19 A.    My brother and my mother help me.

20 Q.    And where does your brother get the money?  He's now the

21 member of Aspen.  Is he getting it from Aspen?

22 A.    Aspen is making minimal money.  If it's making 2 or

23 $3,000 a month, that's all it is.

24 Q.    So what does your brother do for a living that he's able

25 to pay your rent?

1  A.   He has his own business, his own contracting business.

2  Q.   And what's his business?

3  A.   Contracting.

4  Q.   Do you want to -- I'd just like -- in order for the story

5  to be plausible you have to give us detail.

6  A.   That's fine.

7  Q.   And what is his business?  Is he a contractor?

8  A.   He's a contractor.

9  Q.   And what business entity name does he operate under?

10 A.   Triumph.

11 Q.   Okay.  And have you ever been involved in the projects of

12 Triumph?

13 A.   No.

14 Q.   Are you advising him but not employed by him with respect

15 to Triumph?

16 A.   Well, he certainly knows he can call me if he needs --

17 Q.   Okay.  So --

18 A.   But I'm not involved.

19 Q.   -- he does call you --

20 A.   Right.

21 Q.   -- and you help him?

22 A.   Right.

23 Q.   And as a result of that help, is he paying your rent?

24 A.   It's not --

25        MR. ROSEN:  He's not saying that.

1  A.    I'm not saying that.

2         MR. ROSEN:  He said -- all he said is his brother

3  can call him.

4  A.    Let me explain something to you.  For 30 years I was a

5  rainmaker and I made a lot of money in this business and I

6  took care of everybody.

7  Q.    Right.  And you have --

8  A.    And anybody who invested --

9  Q.    -- a very valuable asset.

10  A.    And anybody who invested with me made money.

11  Q.    Okay.

12  A.    Okay?  It's very unfortunate but this last go around in

13  2014, and if anybody reads the papers or goes online and looks

14  and Googles high end luxury real estate Manhattan, you'll find

15  out that 2014 was the height of the market.  Well, I didn't

16  realize that until it was too late.  If you look at these, I

17  bought these --

18  Q.    I just want to --

19  A.    -- properties in 2014 --

20  Q.    I understand you've got a lot of exasperation and that

21  you wish it would continue as every investor who invested in

22  you.  But I'm just asking you a very specific question and

23  that question is do you do any work for your brother?

24  A.    No.

25         MS. O'TOOLE:  Sir, do you have any -- two people are

1   --

2           MALE SPEAKER:  I have one question.

3           MS. KIRBY:  I did.

4           MS. O'TOOLE:  Okay, okay.  Please.

5           MALE SPEAKER:  You sold, or an entity you own or

6   control sold any property in Florida?

7           MR. D'ALESSIO:  Yes.

8           MALE SPEAKER:  When and what property?

9           MR. D'ALESSIO:  I had three condos in Florida.

10  Q.    Those were in Boca Raton?

11  A.    Yeah.

12  Q.    Okay.  And what are the addresses of those?

13  A.    I don't recall the addresses but they're all within the

14  same complex, Ocean Boulevard.

15  Q.    And when were they sold?

16  A.    I think they were all sold in the last year.

17  Q.    So when I asked you about things sold in the last year,

18  did that slip your mind?

19  A.    Yes.

20  Q.    And what entities held those properties?

21  A.    Something to do with their name.

22  Q.    Okay.  So you sold three of them and then was their

23  counterpart a Bluestone entity with respect to them?

24  A.    No.

25  Q.    Did you realize anything from the sale either directly or

1  indirectly?

2  A.    Only the last one.

3  Q.    And how much did you realize?

4  A.    A couple of hundred thousand dollars.

5  Q.    Okay.  So in the last year you got a couple of hundred

6  thousand from Boca Raton, you got a couple of hundred thousand

7  from the property at St. Raymond's, and you got about 600,000

8  from 163-165 East 62nd.

9  A.    Correct.

10  Q.    Correct?  Okay.

11  BY MS. KIRBY:

12  Q.    There were four properties on Ocean Boulevard, correct?

13  1201, 1203, 1208 and --

14  A.    Correct.

15  Q.    -- 405.

16  A.    Four.

17           MS. O'TOOLE:  Do you still own one?

18           MR. D'ALESSIO:  No.

19           MS. O'TOOLE:  So when you say you sold them, did you

20  sell three or four?

21           MR. D'ALESSIO:  I sold all of them, four of them.

22           MR. MANISCALCO:  When was the last one sold?

23           MR. D'ALESSIO:  I don't know the date.

24           MS. O'TOOLE:  But was it sold within three months of

25  filing for bankruptcy?

1   MR. D'ALESSIO:  Within three months of filing,

2   probably yes.

3   MR. MANISCALCO:  It was a 2018 sale?

4   MR. D'ALESSIO:  Yes.

5   Q.   After March 28th?

6   A.   I don't know.

7   Q.   What about the properties located at 225 East 81st Street?

8   A.   What about them?

9   Q.   Do you still have an interest in --

10  A.   No.

11  Q.   -- a company that owns that property?

12  A.   No.

13  Q.   You have an interest in 225 81 Street Associates LLC,

14  correct?  It's listed in your petition as being an entity that

15  you have an interest in.

16  Q.   What's the name of the entity?

17  A.   225 81 Street Associates LLC.

18  Q.   I can't answer the question but it doesn't own any assets

19  and I don't know why it's listed.

20  A.   What about 554 East 82nd Street?

21  Q.   I don't have an interest in that either.

22  A.   It's listed in the petition as being an LLC which you

23  have an interest.

24  Q.   I think the --

25  MR. ROSEN:  I [inaudible] the LLC has property --

1      MR. D'ALESSIO:  I think the question was

2      MS. KIRBY:  He said he had no --

3      MR. D'ALESSIO:  -- in the last five years, right?

4  Wasn't the question in the last five years?

5      MS. KIRBY:  I didn't set up a specific time period.

6      MR. D'ALESSIO:  I think that's why they're down

7  there.  I think the question on the petition was in the last

8  five years.

9  Q.    In the last five years did you have an interest --

10  A.    Yes.

11  Q.    -- in an LLC?

12  A.    Yes.

13  Q.    What about 230 East 63rd Street?

14  A.    I don't have an -- there's no -- I have no interest in

15  it.

16  Q.    What about 2627 Webster Avenue?

17  A.    I don't have an interest.

18  Q.    What about 2800 Bruckner Boulevard?

19  A.    I don't have an interest.

20  Q.    That property has been sold?

21  A.    Yes.

22  Q.    When was it sold?

23  A.    I don't know.

24  Q.    Within the last two years?

25  A.    Probably within the last two years, yes.

1  Q.   About a year ago?

2  A.   Within the last two years.

3  Q.   And how much did it sell for?

4  A.   10 million.

5  Q.   And how much of that was profit to you, if any?

6  A.   I can't tell you that because I don't know what the basis

7  is.

8  Q.   Did you come away from cash from closing?

9  A.   Yes.

10  Q.   How much?

11  A.   A couple of million dollars.

12  Q.   Two, three, four?

13  A.   I don't recall the amount.

14  Q.   More than one?

15  A.   Yeah.

16  Q.   More than 2?

17  A.   I believe so.

18  Q.   More than 3?

19  A.   I don't think so.

20  Q.   You're not sure?  What about the property located at 3100

21  Tremont?

22  A.   I still own that property.

23  Q.   How much is it worth?

24  A.   It's worth nothing now.  The mezz lender just took it

25  over and paid off the first and took it over.

1  Q.   Foreclosed on it?

2  A.   Yeah.

3  Q.   What about 3219 Tremont?

4  A.   The same mezz lender took it over.

5  Q.   Foreclosed?

6  A.   Right.

7  Q.   Within the last six months?

8  A.   Yeah.

9  Q.   But the mezz lender, who's the mezz lender?

10  A.   No relationship but their parent company is Bluestone

11  something.

12  Q.   How did you meet this mezz lender?

13  A.   Through my mortgage broker that did all my deals.

14  Q.   And was there someone at this mezz lender that you knew

15  before?  Friend, family?

16  A.   No.  They're actually a hostile lender.

17  Q.   And what about 3225 Tremont?

18  A.   Same thing.

19  Q.   Same mezz lender?

20  A.   Yeah.

21  Q.   Bluestone 3225 LLC, did it receive any funds as a result

22  of any of these transactions?

23  A.   It may have.  It should have received funds.  I think

24  it's also -- I think I'm also owed several million dollars on

25  that.

1  Q.   How did it receive funds if the properties were

2  foreclosed on?

3  A.   Well, this is before the property was foreclosed on.

4  Q.   Okay.

5  A.   You're asking 53rd Street?

6  Q.   I was asking as a result of these foreclosures.

7  A.   No, no, no, no, I didn't get any funds.

8  Q.   3800 Tremont?

9  A.   3800?  3800 never went through.  It was formed to buy a

10 building and the deal fell through.

11 Q.   Why didn't 39 Middle Pond entities file for bankruptcy?

12 A.   We are.

13 Q.   You're going to?

14 A.   Yes.

15 Q.   When?

16 A.   I think --

17         MR. ROSEN:  When I finish them.  Probably next

18 [inaudible].

19         MS. KIRBY:  Sure.

20 BY MR. KYE:

21 Q.   Hi, I'm Matthew Kye for Preferred Bank.  I just have a

22 couple of questions regarding East 67th and East 64th Street.

23 Is it your testimony that the condominium process is complete

24 on East 67th and those individual units can be sold separately?

25 A.   Yes.

Q.   Okay.  And how long has Aspen Management been collecting
the rents from East 67th and East 64th?

A.   I have no idea.  From whenever there was tenants in
there.

Q.   Are there tenants there now?

A.   There's tenants in the building.

Q.   Do you know what the approximate rent roll for East 64th
is?

A.   No, I do not.

Q.   Who would know that?

A.   Rita.

Q.   And how about East 67th?

A.   I have no idea.

Q.   Do you know what Aspen Management did with the money
after they collected the rents?

A.   Put it in the bank.

Q.   And you know what bank that was?

A.   No.

Q.   Who would know that?

A.   Rita.

Q.   Do you know if the bank was -- you said you were changing
bank accounts recently due to the BOB issues.  Do you know if
you changed bank accounts with respect to where the East 67th
and 64th monies were?

A.   I definitely changed bank accounts because Preferred had

1  them and then we moved them out of Preferred.

2  Q.   And you don't know where though?

3  A.   No.

4  Q.   Okay.  Is it your -- do you recognize this?

5  A.   Yes.

6  Q.   Is that something that you gave to Preferred?

7           MS. O'TOOLE:  Can I --

8  A.   Possibly.  I don't know.

9           MS. O'TOOLE:  For the purposes of the record we need

10  to identify it as an exhibit.  Just call it 341 Exhibit 1.

11  Okay?  It's identified as a document entitled Michael Paul

12  Enterprises LLC.  It's called an income and express pro forma

13  on rental basis and it appears to be undated.

14  Q.   And this is for East 67th Street?

15  A.   I have no idea if that was given to Preferred.

16  Q.   If you look at this, from review of this, do you think

17  that's accurate?

18  A.   It might have been accurate.  I don't think it's accurate

19  anymore.

20  Q.   Who prepared this document?

21  A.   I have no idea.

22  Q.   Did you have anything to do with that document,

23  preparation of it?

24  A.   No.

25  Q.   Did Rita prepare that document?

1  A.   I don't know.

2  Q.   How would Preferred get this document if they did?

3  A.   I don't know if they did.

4  Q.   But you've never seen this document before?

5  A.   It looks familiar.  That's the way we do pro formas.

6  Q.   But you don't know if any of the numbers here are

7  accurate or not?

8  A.   No.

9  Q.   If I showed you one for East 64th would your answers be

10 the same?

11 A.   Yes.

12       MR. KYE:  Okay.  No further questions.

13       MS. O'TOOLE:  We have a very limited opportunity.

14       MALE SPEAKER:  Yeah, I just have two follow-up

15 questions.

16       MS. O'TOOLE:  We are up to our call coming in.

17       MALE SPEAKER:  Just two follow-up questions based on

18 --

19       MS. O'TOOLE:  Okay.

20       MALE SPEAKER:  -- [inaudible].

21 BY MALE SPEAKER:

22 Q.   You said you took approximately $600,000 out of

23 [inaudible] transactions in connection with 163, 165, and 167

24 East 67th Street?

25 A.   Correct.

1    Q.    You want to briefly explain [inaudible] what entities

2    received it?

3    A.    I have no idea what entity received it.  Ultimately it

4    went to me though.

5    Q.    Okay.  And was any, to your knowledge, was any money

6    distributed [inaudible]?

7    A.    No.

8    Q.    I have the same question on 2800 Bruckner.  You received

9    approximately a couple of million dollars [inaudible] 2800

10   Bruckner and what basis did you receive that money?

11   A.    I'm sorry?

12   Q.    On what basis did you receive that two to $3 million from

13   the sale of 2800 Bruckner?

14   A.    There were no investors in the deal when I received the

15   money.

16   Q.    And you said you received the money approximately two

17   years ago?

18   A.    Probably about two years ago.

19   Q.    When was the last time you knew that there were investors

20   [inaudible]?

21   A.    I don't understand the question.

22   Q.    Your testimony is 2 to $3 million for the sale of 2800

23   Bruckner.

24   A.    Correct.

25   Q.    Three to four years ago.  I'm sorry, approximately two

1  years ago.  At that time there were no investors in 2800

2  Bruckner?

3  A.   Not that I recall.

4          MALE SPEAKER:  Okay.  I just have a couple of quick

5  questions about the same thing.

6  BY MALE SPEAKER:

7  Q.   So I'm going back to the 145-147 East 62nd Street.

8  There's a series of tenants listed there.  One of the tenants

9  is Alexander Greenstone as having a residential apartment

10  there.  Is that person paying rent?  Do you know about --

11  A.   I have no idea but I would assume he's paying rent.

12  Q.   There's a series of investors listed on your Schedule G

13  for this particular case.  This is 18-22892.  Can you describe

14  or identify any of the rent paid by any of these tenants?

15  A.   No.

16  Q.   Is that going to be also in the QuickBooks?

17  A.   Yes.

18          MS. O'TOOLE:  Okay.  Listen, I don't mean any

19  disrespect.  We've gone for an hour and 45 minutes.  We can

20  always resume.  I'm going to adjourn until August 23rd at 5

21  p.m., but that's a control date, not an actual date.  We can

22  figure out another date.  But I have to get on.

23          MR. D'ALESSIO:  Thank you.

24                    *  *  *  *  *  *

25

1    I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5  _Mary Greco_

   _____

6                  Mary Greco

7  Dated:  August 3, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25