# EXHIBIT D

```
 1

 2

 3    ----------------------------------------X
                                      : 18-22552
 4    In re:                          :
                                      :
 5       MICHAEL P. D'ALESSIO,        :
                                      : June 14, 2018
 6              Debtor.               :
      ----------------------------------------X
 7

 8                  TRANSCRIPT OF 341 MEETING
                   BEFORE MARIANNE O'TOOLE
 9

10    APPEARANCES:

11
      For the Debtor:         SANFORD P. ROSEN, ESQ.
12                            Rosen & Associates
                              747 Third Avenue
13                            New York, New York 10017

14    For the Trustee:        MARIANNE O'TOOLE
                              22 Valley Road
15                            Katonah, New York 10536

16    For Attis Properties:   DAWN KIRBY, ESQ.
                              DelBello Donnellan Weingarten Wise &
17                             Wiederkehr, LLP
                              1 North Lexington Avenue
18                            White Plains, New York 10601

19    For Preferred Bank:     MATTHEW KYE, ESQ.
                              Kye Law Group, P.C.
20                            201 Old Country Road, Suite 120
                              Melville, New York 11747
21
      For Greater Hudson:     BONNIE L. POLLACK, ESQ.
22                            Cullen and Dykman, LLP
                              100 Quentin Roosevelt Boulevard
23                            Garden City, New York 11530

24    For John Pantanelli:    DANIEL S. PERLMAN, ESQ.
                              160 Broadway 4th Floor
25                            New York, New York 10038

                  [Appearances continue next page.]

      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service
```

```
1                                                                    2

2

3    APPEARANCES CONTINUED:

4
     For Andrew West:        ANDREW WEST, Pro Se
5

6    For the Millers, et al: JAMES J. VINCEQUERRA, ESQ.
                             Alston & Bird LLP
7                            90 Park Avenue
                             New York, New York 10016
8
     For Jennifer Chervin:   NEIL CHERVIN
9

10   For BNB Bank:           NANCY FOSTER

     For Fogliano:           TAB K. ROSENFELD, ESQ.
11                           Rosenfeld & Kaplan, LLP
                             1180 Avenue of the Americas
12                           Suite 1920
                             New York, New York 10036
13

14
     Court Transcriber:      MARY GRECO
15                           TypeWrite Word Processing Service
                             211 N. Milton Road
16                           Saratoga Springs, New York 12866

17

18

19

20

21

22

23

24

25
```

3

1          MS. O'TOOLE:  In re Michael P. D'Alessio, case

2    number 18-22552.

3          MR. ROSEN:  Marianne?

4          MS. O'TOOLE:  Yes.

5          MR. ROSEN:  Where do you want us?

6          MS. O'TOOLE:  Mr. D'Alessio there and Mr.

7    [inaudible] here.  Thank you.

8          MR. D'ALESSIO:  Good afternoon.

9          MS. O'TOOLE:  Good afternoon.  If you would raise

10   your right hand.

11              ( MICHAEL D'ALESSIO, DEBTOR, SWORN.)

12         MS. O'TOOLE:  Okay.  And counsel, if you'll note

13   your appearance, please?

14         MR. ROSEN:  Sanford Rosen; Rosen & Associates.

15         MS. O'TOOLE:  Thank you.  Now, did you bring the

16   signed pages of the petition for me?

17         MR. ROSEN:  I did because you asked for it.

18         MS. O'TOOLE:  Well, there we go.  We're starting off

19   on the right foot.

20         And what we'll do is we'll start by whoever would

21   like to note their appearance.  So we'll start here on the

22   right.

23         MS. KIRBY:  Dawn Kirby; DelBello Donnellan,

24   representing creditor Attis Properties, Inc.

25         MS. O'TOOLE:  Thank you.  And next?

4

1          MR. KYE:  Matthew Kye, the Kye Law Group,

2     representing Preferred Bank.

3          MS. O'TOOLE:  Thank you.  Anybody else that would

4     like to note their appearance?

5          MS. POLLACK:  Bonnie Pollack; Cullen & Dykman for

6     Greater Hudson Bank.

7          MS. O'TOOLE:  Thank you.  Would you like to come

8     forward?  It's up to you.

9          MS. POLLACK:  I'll sit here.

10          MS. O'TOOLE:  Okay.  Anybody else that would like to

11     note their appearance?  If you'd just step forward because we

12     do record it.  If you don't mind.  Even if you want to go back

13     after you do it.  Okay?

14          MR. PERLMAN:  Daniel Perlman of counsel to James

15     Pagano for John Pantanelli.

16          MS. O'TOOLE:  Okay.

17          MR. WEST:  Andrew West.

18          MS. O'TOOLE:  And is that on your own behalf, sir?

19          MR. WEST:  On my own behalf, yes.

20          MS. O'TOOLE:  You're a creditor?

21          MR. WEST:  Yes.

22          MS. O'TOOLE:  Okay.  Next?

23          MR. VINCEQUERRA:  James Vincequerra; Alston & Byrd

24     on behalf of David Miller, Allan Miller and other similarly

25     situated --

5

1          MS. O'TOOLE:  If you would be -- come close and just

2    say that clearly so we have it on the record.

3          MR. VINCEQUERRA:  James Vincequerra; Alston & Byrd

4    on behalf of David Miller, Allan Miller and a number of other

5    similarly situated --

6          MS. O'TOOLE:  Okay.  Thank you.

7          MR. CHERVIN:  Neil Chervin, C-H-E-R-V-I-N, on behalf

8    of my wife Jennifer Chervin.

9          MS. O'TOOLE:  Thank you.  Anybody else?

10         MS. FOSTER:  Nancy Foster, BNB Bank.

11         MS. O'TOOLE:  Thank you.  And sir?

12         MR. ROSENFELD:  Tab Rosenfeld; Rosenfeld & Kaplan,

13   on behalf of Rella Fogliano and a series of other creditors.

14         MS. O'TOOLE:  Thank you.  Is there anybody else

15   who's present that would like to note their appearance?  Okay.

16   Does anybody have an objection to my serving as the trustee in

17   the matter?  I'll serve as the trustee in this matter.  Sir,

18   may I have your identification, please?  And do you have a

19   social security card?

20         MR. D'ALESSIO:  I don't.

21         MS. O'TOOLE:  Okay.  Normally I wouldn't proceed

22   without it but I have a room full of people that I won't

23   inconvenience by resuming --

24         MR. D'ALESSIO:  I'm sorry.

25         MS. O'TOOLE:  -- I mean by adjourning.  I do need

6

1  your social security and I will have to verify your ID.  My

2  next hearing date is July 12ᵗʰ.  If you come back with your

3  driver's license and social, I'll leave it to your attorney if

4  he feels it needs to be present, but you could come at the

5  beginning of my calendar and show me your social and your

6  photo ID.  Is that acceptable to you?

7         MR. D'ALESSIO:  Mm hm [positive inflection].

8         MS. O'TOOLE:   You have to answer for the record so

9  I have it.

10        MR. D'ALESSIO:  Yeah, that's fine.

11        MS. O'TOOLE:  All right, sir.  So I'm returning to

12  you your New York State driver's license but I have not been

13  able to verify your social security number.

14        MR. D'ALESSIO:  Thank you.

15        MS. O'TOOLE:  Okay.  And you understand that a

16  bankruptcy petition was filed against you involuntarily,

17  correct?

18        MR. D'ALESSIO:  Correct.

19        MS. O'TOOLE:  And you also understand that there

20  came a point where by agreement an order was entered

21  permitting the bankruptcy to go forward?

22        MR. D'ALESSIO:  Correct.

23        MS. O'TOOLE:  Correct?  And counsel, I'm going to

24  need the signed petition to show it your client to confirm his

25  signatures.  So --

7

1      MR. ROSEN:  Do you have this?

2      MS. O'TOOLE:  I have a whole petition but I don't

3  have signatures.  I have electronic signatures, not actual

4  signatures.

5  BY MS. O'TOOLE:

6  Q.    So I'm going to show you, sir, a declaration about your

7  individual debtor schedules and official form 107 statement of

8  financial affairs for individuals; a form 108, statement of

9  intention for individuals; and a form 121, a statement about

10 your social security number.  There's a verification of the

11 creditors matrix.  There's a statement of your current monthly

12 expenses.  I'd ask you to look through that and confirm that

13 those are your signatures on there.

14 A.    Yes, they are.

15 Q.    And did you have an opportunity to look at the schedules

16 and summary assets and liability statement of financial

17 affairs that your counsel filed in this proceeding on or about

18 May 30, 2018 as ECF document number 24?

19 A.    Yes.

20 Q.    Okay.  And I'd just ask you to just take a moment.  I

21 have put it in a binder.  You'll see that that document starts

22 at Page 1 and continues to Page 384 and just verify that is

23 what you reviewed with your attorney and you caused to be

24 filed in the bankruptcy court.  Minus my highlights.

25 A.    Yes.

8

1   Q.   Thank you.  And have you listed all of your creditors on

2   your bankruptcy petition now?

3   A.   Yes.

4   Q.   Have you listed everything you own directly or indirectly

5   through corporate entities on your bankruptcy petition?

6   A.   Yes.

7   Q.   Do you have any changes or amendment you wish to make to

8   the petition or schedules?

9   A.   There was one change that I wanted to make.  Can I take a

10  look at that a moment?

11  Q.   Okay.  Do you have a general sense of what it pertains

12  to?

13  A.   I don't recall.

14  Q.   Okay.

15  A.   It's fine.

16  Q.   Okay.  Well, let me just say if and when you need to make

17  an amendment you would need to obviously deal with your

18  attorney and file the amendment if there's some change that

19  you need to make.  You understand that?

20  A.   Yes.

21  Q.   But you've listed all of your assets?

22  A.   Yes.

23  Q.   Okay.  And the bankruptcy was filed on April 17, 2018

24  involuntary.  You understand that?

25  A.   Yes.

9

1   Q.   And was there a point in time that you are aware of that

2   a TRO was entered in connection with any litigation that

3   existed?

4   A.   Yes.

5   Q.   And when do you understand that TRO would have been

6   entered?

7   A.   I don't recall the date.

8   Q.   If I told you that it was March 28, 2018, would that

9   refresh your recollection?  About then?

10  A.   Okay.

11  Q.   So maybe shortly before the involuntary petition.  Do you

12  understand that?

13  A.   Mm hm [positive inflection].

14  Q.   Okay.  Now you've owned various pieces of real property

15  either in your own name or through corporate entities, isn't

16  that correct?

17  A.   Correct.

18  Q.   And you have -- so I'm going to -- we'll start -- let me

19  do some background stuff before.  Who's Diona [Ph.] D'Alessio?

20  A.   My daughter.

21  Q.   Who is Bianca D'Alessio?

22  A.   My daughter.

23  Q.   Who's Irene D'Alessio?

24  A.   My mother.

25  Q.   Who's Dominick Shintino [Ph.]?

10

1    A.    My brother-in-law.

2    Q.    And who's William Orrico [Ph.]?

3    A.    A friend.

4    Q.    O-R-R-I-C-O.  He's a friend?

5    A.    A friend and --

6    Q.    Has he been involved in any investments with you?

7    A.    He just got involved a couple of months ago.

8    Q.    Your testimony is he's not been involved in any of your

9    business dealings prior to a couple of months ago?

10   A.    Correct.

11   Q.    Okay.  And then on the bankruptcy petition you have

12   provided a schedule which identifies a variety of entities and

13   that schedule starts on Page 369 of 383 of the bankruptcy

14   petition.  Do you recall that schedule that lists the entities

15   that you have interest in?

16   A.    Yes.

17   Q.    Okay.  And is that a complete and exhaustive list of all

18   the entities that you have an interest in directly or

19   indirectly?

20   A.    Yes.

21   Q.    And the address that those entities, with the exception

22   of a few, are at 12 Water Street, Suite 204 in White Plains.

23   Is that correct?

24   A.    Correct.

25   Q.    And do you still have custody, possession, and control of

11

1  that location?

2  A.    No.

3  Q.    Who has -- what is the current situation with respect to

4  that location?

5  A.    It was turned over to the landlord.

6  Q.    And when was that turned over to the landlord?

7  A.    Several months ago.

8  Q.    And where are the books and records of these various

9  business entities currently located?

10  A.    On a hard -- we were always paperless.  It's on a hard

11  drive.

12  Q.    And where is the hard drive located?

13  A.    I have one in my apartment.

14  Q.    And when you say your apartment, what apartment is that?

15  A.    Manhattan.

16  Q.    And is that -- can you give us the address of the

17  apartment?

18  A.    My primary residence is 265 East 66th Street, 28F, New

19  York, New York 10065.

20  Q.    28F?

21  A.    Yes.

22  Q.    Okay.  Were you previously living in 29B?

23  A.    No.

24  Q.    Okay.

25        MR. ROSEN:  Are you looking at the involuntary?

12

1    MS. O'TOOLE:  No, I'm looking at an apartment lease.

2  Q.   You're saying you're in 26F?

3  A.   Correct.

4  Q.   28F?  28F?

5  A.   28F.

6  Q.   28F.  Okay.  And this hard drive is located in that

7  apartment?

8  A.   Correct.

9  Q.   And are there any other copies of the hard drive?

10  A.   I believe my accountant has one.

11  Q.   And the accountant is Anthony Peshi [Ph.]?

12  A.   Yes.

13  Q.   And are you certain that he has a copy?

14  A.   Yes.

15  Q.   All right.  I'm sure you know already because there's

16  litigation pending but nothing can be done to alter, destroy,

17  modify or --

18  A.   Correct.

19  Q.   -- do anything with respect to that hard drive.  We will

20  immediately, meaning trustee and counsel, endeavor to get a

21  copy of that probably as soon as this week either through you

22  or your accountant.  Is it your testimony under penalty of

23  perjury that the entirety of the books and records for all of

24  the entities for you individually are located on that hard

25  drive?

13

1  A.   Correct.

2  Q.   And is it a removable drive?

3  A.   Yes.

4  Q.   And has it always been on that removable drive?

5  A.   It was updated every day, yeah.

6  Q.   Did there come a point in time where documents were

7  downloaded from another computer?

8  A.   No.

9  Q.   No?  Was anything ever saved on a cloud?

10  A.   No.

11  Q.   What email addresses do you use?

12  A.   MP@MichaelPaulEnterprises.

13  Q.   Is that the only address you use?

14  A.   Yes.

15  Q.   Do you use any address for personal matters?

16  A.   Now I do after this bankruptcy.

17  Q.   And do you use a particular server or iCloud for your

18  email at MP@MichaelPaulEnterprises.com?

19  A.   We have -- everything is on the hard drive.  It was I

20  think on Outlook.

21  Q.   When you say everything's on the hard drive, are you

22  saying that you took a static snapshot of all of the emails as

23  of the bankruptcy?

24  A.   No.

25  Q.   Okay.  So what do you mean about your emails are on a

14

1    hard drive?

2    A.    We had a server and it would be updated, the hard drive

3    would be updated every night.

4    Q.    And who -- you used Outlook?

5    A.    Yes.

6    Q.    Did you have an IT person that you dealt with?

7    A.    Not really.

8    Q.    Well, did you use anyone at all?

9    A.    From time to time if something went down we would call

10   somebody.

11   Q.    Did you have a website?

12   A.    Yes.

13   Q.    And what was the web address or is the web address?

14   A.    MichaelPaulEnterprises.com.

15   Q.    And did someone create the web address for you?

16   A.    Yes.

17   Q.    And who did that?

18   A.    I don't remember.

19   Q.    Is there any document that would refresh your

20   recollection of who created that for you?

21   A.    No.    It's very old.

22   Q.    With respect to the email, how many people had an email

23   address on MichaelPaulEnterprises.com?

24   A.    I would probably say six to ten.

25   Q.    And who were those people?

15

1   A.    Myself, Rita --

2   Q.    What's Rita's last name?

3   A.    Reyes.

4   Q.    How do you spell that?

5   A.    R-E-Y-E-S.

6   Q.    Okay.

7   A.    Jessica Ramos.

8   Q.    Next?

9   A.    Possibly Yvonne Scatino [Ph.].

10  Q.    And that is your ex-wife?

11  A.    Correct.

12  Q.    And did she use an address that was Scatino or that was

13  D'Alessio?

14  A.    I'm not sure.  I don't know if she used it at all because

15  she really wasn't involved in the business.

16  Q.    Okay.  Well, did she have any capacities in any of the

17  LLCs that you had --

18  A.    No.

19  Q.    -- or appropriated entities?  She was a member though?

20  A.    No.

21  Q.    Is it your testimony that she was not a member of any of

22  the LLCs?

23  A.    At one point she might have been 1 percent of some --

24  Q.    So she was.  Well, would it refresh your recollection,

25  for instance, with respect to Katsura Consulting Group LLC

16

1   that she was a 1% member?

2   A.   Yes.

3   Q.   Would it refresh your recollection that with respect to

4   Scott Consults 2, LLC that she was a 1 percent member?

5   A.   Correct.

6   Q.   So she did have a membership interest in some of the

7   LLCs, correct?

8   A.   Yes.

9   Q.   Okay.  So you don't know what email address she actually

10   used?

11   A.   No.

12   Q.   Next, you were going through people who had email

13   addresses.  What are they?

14   A.   Some workers in the field.

15   Q.   And who would be the workers in the field?

16   A.   My brother Ronald D'Alessio.

17   Q.   Who else?

18   A.   Dean Carotenuto.

19   Q.   Spell the last name.

20   A.   D-E-A-N, Carotenuto, C-A-R-O-T-E-N-U-T-O.

21   Q.   Anybody else?

22   A.   Phil Bero, B-E-R-O.

23   Q.   Anyone else?

24   A.   I think that's about it.

25   Q.   And are these individuals able to continue to access the

17

1  email?

2  A.    No.

3  Q.    Are you able to access the email yourself?

4  A.    No.

5  Q.    And why not?

6  A.    Because I shut the business down months ago.

7  Q.    I'm sorry, but what happened with respect to the Outlook?

8  A.    I have no idea.  They don't work for me anymore.

9  Q.    Okay.  That's a little different than what happened to

10 the Outlook.  I know --

11 A.    I don't know.  I can't answer that.

12 Q.    You don't know?  Can you access it at all?

13 A.    I believe you can.

14 Q.    So one of the issues in here is taking a static view of

15 what existed.  And in addition to documents on a hard drive,

16 you can't do anything to alter, destroy, remove in any way

17 emails.

18 A.    Correct.

19 Q.    So I'm trying to figure out how we access the email.

20 Were you using Outlook 365?  Were you using Outlook

21 Professional?

22 A.    I don't know.  I don't know anything about this.

23 Q.    I know.  So it's above what you do.  I'm with you.

24 A.    Right.

25 Q.    I don't know how mine works either.  But my point is who

18

1  would tell us how that works?

2  A.   Rita.

3  Q.   Rita?

4  A.   Reyes.

5  Q.   Where is the server?

6           MR. ROSEN:  What server?

7           MS. O'TOOLE:  He testified that it was on a server.

8           MR. D'ALESSIO:  I have no idea what a server is.

9  Everything is on a hard drive.

10 Q.   Did you have any computers?

11 A.   Yes.

12 Q.   And were they laptops or standalone stations?

13 A.   A couple of standalone.

14 Q.   And where are those currently located?

15 A.   We disposed of everything when we left.

16 Q.   When did you dispose of computers?

17 A.   When we left the office.

18 Q.   And when did you do that?

19 A.   Several months ago.  Everything is on a hard drive

20 though.

21           MR. ROSEN:  I'm sorry, several or seven?

22           MR. D'ALESSIO:  Several.

23 Q.   Okay.  Several months ago.

24 A.   Yeah.  Everything is on a hard drive though.

25 Q.   Were hard drives removed from the computers and

19

1   destroyed?

2   A.    I have no idea.

3   Q.    How many standalone computers were located at 12 Water

4   Street?

5   A.    Maybe six.

6   Q.    And were there any laptop computers?

7   A.    No.

8   Q.    Do you personally have a laptop computer?

9   A.    No.

10  Q.    Do you use any computer currently?

11  A.    No.

12  Q.    If you wanted to look up something on the internet, what

13  would you do?

14  A.    Use my phone.

15  Q.    And when did you last have access to any computer?

16  A.    I'm not a computer guy so I really didn't use computers.

17  Q.    Just stick to the questions, okay?  When did you last

18  have access to any computer?

19  A.    Months ago.  When I closed down my office.

20  Q.    And what date did you close the office?

21  A.    I don't know that date.

22  Q.    Was it in January?

23  A.    No.  It was in June.

24  Q.    In June?

25  A.    No, we're in June.  So it had to be maybe three months

20

1   ago.  Two or three months ago.

2   Q.   Did there come a time when you wrote a letter to

3   investors advising them that things were not going well and

4   you signed it under Michael Paul Enterprises, LLC?

5   A.   Yes.

6   Q.   And did that occur in or about February 26, 2018?

7   A.   Yes.

8            MS. O'TOOLE:  And I'm going to mark this Trustee's

9   Exhibit 1 just to refresh your recollection.

10  Q.   Is that the letter that -- if you take a moment to look

11  at that letter.  Yes?  Do you recognize that letter?

12  A.   Yes.

13  Q.   And that's dated February, is that correct?

14  A.   Yes.

15  Q.   And does that refresh your recollection whether you

16  closed the business or -- withdrawn.  Left 12 Water Street

17  before or after this letter was written?

18  A.   After that letter.  I would say it was March or April.

19  Q.   Okay.  And after this letter.  And I would just draw your

20  attention to the stamp at the bottom of the letter which

21  indicates

22  c:\michaelpaulenterprisesllc\investors\letterstoinvestors.  Do

23  you see that at the bottom?

24  A.   Yes.

25  Q.   The stamp on it?

21

1   A.    Yes.

2   Q.    Does that refresh your recollection that documents were

3   saved in a Z drive?

4   A.    Yes.

5   Q.    And is that Z drive the hard drive that you are referring

6   to?

7   A.    Yes.

8   Q.    And so you would have left the premises -- withdrawn.

9   You would have caused the LLCs located at 12 Water Street to

10  have vacated the premises sometime after February 26th, is that

11  right?

12  A.    Yes.

13  Q.    You said at the beginning do you recall that there was

14  the TRO entered in or about March?

15  A.    Yes.

16  Q.    Did you vacate the premises before the TRO was entered or

17  after the TRO was entered?

18  A.    I believe after but I am not sure.

19  Q.    So when you disposed of the computers, you did that

20  before you left 12 Water Street, correct?

21  A.    I was actually not in town so I don't know the exact

22  date.

23  Q.    Who emptied the premises for you?

24  A.    Rita and Jessica.

25  Q.    And did you provide any instruction to them as to what

22

1   should be done with the contents of the office?

2   A.   Just to leave the big stuff there.

3   Q.   And can you tell me the square footage of the office?

4   A.   1,600 feet, 2,000 feet.  Something like that.

5   Q.   And is there a letter where you surrendered the premises

6   back to the landlord?

7   A.   No.

8   Q.   Is there any document that exists that would identify

9   what date you surrendered the premises or vacated the

10  premises?

11  A.   No, but the girls would know.

12  Q.   Okay.  And by the girls you're referring --

13  A.   They turned the keys over --

14  Q.   -- to Rita and Jessica?

15  A.   Yes.

16  Q.   And they turn the keys over?

17  A.   Yes.

18  Q.   Was anything removed from the premises when the premises

19  were vacated?  I think the answer is yes because you said --

20  A.   I'm sure.

21  Q.   -- the hard drive, right?

22  A.   I'm sure.  Right.

23  Q.   Did there come a point where anybody delivered to you any

24  of the contents of the office after they were vacated?

25            MR. ROSEN:  Delivered to him?

23

1          MS. O'TOOLE:  Yes.

2  Q.    How did you get the hard drive?

3  A.    The hard drive was given to me.

4  Q.    And how was that given to you?

5  A.    From Rita.

6  Q.    And when did Rita give it to you?

7  A.    I don't recall.

8  Q.    Where were you located when she gave it to you?

9  A.    I don't recall that either.

10 Q.    And when she gave you the hard drive, did she give you

11 anything else?

12 A.    No.

13 Q.    Did anybody ever call you up and say there are six

14 computers here, Mike, what do you want me to do with them?

15 A.    They said what do you want me to do with the stuff in the

16 office?  And I said --

17 Q.    And what did you say?

18 A.    I said take what you want, throw out the rest.  If

19 anybody wants anything, they could have it and throw the rest

20 out.

21 Q.    All right.  I'm going to make a demand for any

22 information related to the email.  I don't know if the IP

23 address was somehow saved --

24 A.    What email?  You mean my email?

25 Q.    The email that we just discussed,

24

1   MichaelPaulEnterprises.com.  And to be as broad as possible

2   I'm requesting any and all information related to any and all

3   email that was used in conducting business.  You have

4   testified that there is the MichaelPaulEnterprise.com email

5   but to the extent it includes anything else, my request will

6   encompass that.  Generally an email is reserved through

7   GoDaddy, through --

8   A.    GoDaddy.

9   Q.    -- through something.  Okay.

10  A.    That's what it is.

11  Q.    So that might be how you registered the domain.

12  A.    It's GoDaddy.

13  Q.    The domain.  But then are the emails served in a -- saved

14  in a cloud or otherwise?

15  A.    I don't know.

16  Q.    Who is going --

17  A.    Rita.

18  Q.    Rita.

19  A.    I will ask her and get you the answers.

20  Q.    And that's Rita Reyes?

21  A.    Yes.

22  Q.    And where would I find Rita Reyes?  What's her address?

23  A.    I don't know her address.

24  Q.    What town does she live in?

25  A.    Bronxville.

25

1  Q.   And how long did Rita Reyes work for you?

2  A.   Years.  I don't know how many years.

3  Q.   So we're very clear that to the extent you have any

4  electronic data stored in any form whether it be through a

5  hard drive, remotely on a cloud, that you have to preserve all

6  of that information.  Is that clear?

7  A.   Yes.

8  Q.   Was there any period of time by which emails were kept

9  and then destroyed?

10 A.   No.

11 Q.   There was no automatic destroy after two months?

12 A.   No.

13 Q.   And when you saved emails, would you create subfolders in

14 your personal email box by job?

15 A.   No.

16 Q.   They're all in just a general email?  Is that correct?

17 A.   Correct.

18 Q.   Would you save your emails into the folders on your Word

19 or Adobe system?  No?  You have to answer out loud.

20 A.   When I give you the GoDad -- when I give you how to get

21 to GoDaddy, you'll have all the emails.

22 Q.   Okay.  Just be careful because GoDaddy may be the domain

23 but it may not be the provider and I'm not sure it will be.

24 A.   Okay.  I don't know any --

25 Q.   It might be like Yahoo.  There's all different versions

26

1  of it.

2  A.    I never -- I read emails.  I never put them in files or

3  folders or anything like a --

4  Q.    Did anyone do that for you?

5  A.    No.

6  Q.    Okay.  So then how about bank records?

7  A.    We can get you all the bank records.

8  Q.    Well, how did you receive bank statements?  Was that by

9  email or was that -- I mean by electronic --

10  A.    Could have been email or mail.

11  Q.    And then there were certain bank statements that have

12  been put in a location for us to look at and we will drill

13  down more into the details, but let me be very clear again

14  that you need to preserve whatever bank statements that you do

15  have for any and all of the LLCs --

16  A.    We have them.

17  Q.    -- that are listed on the bankruptcy petition.  And is

18  your testimony that those statements are saved on the hard

19  drive as well?

20  A.    Yes.  I believe when they reconcile, statements would

21  either come in email or in the mail.

22  Q.    Okay.

23  A.    They would reconcile and they would be saved in a

24  QuickBooks file.

25  Q.    Okay.  How about tax returns?  Were they saved

27

1  electronically?

2  A.    It's all saved.  We have everything.

3  Q.    All right.  Electronically.  And they will be on the hard

4  drive?  Is that your testimony?

5  A.    Correct.

6  Q.    Okay.  How about prospectus that you would deliver or

7  create to --

8  A.    All saved.

9  Q.    It's all on the hard drive?

10  A.    All saved.

11  Q.    And how did you ensure that that occurred?

12  A.    I didn't ensure it but the girls were strictly -- they

13  were pretty organized and --

14  Q.    Okay.  All right.

15  A.    They knew if something went out or came in it gets saved

16  on the computer.

17  Q.    Okay.  So everything was saved on the computer and then

18  it was also saved on the hard drive?

19  A.    No, it was saved on the computer and then it would be

20  saved, uploaded or whatever, saved on the hard drive, that

21  everything would be on the hard drive.

22  Q.    So the computer that you're referring to, what computer

23  is that?

24  A.    Like Rita's computer or Jessica's computer.

25  Q.    So they had standalone computers?

28

1   A.    Yes.  Desktop.

2   Q.    But your testimony is that anything that was on any of

3   the computers in the office made their way to the hard drive?

4   A.    Yes.

5   Q.    And that would be true for offerings, private placement,

6   memos, pro formas?

7   A.    Everything.

8   Q.    Everything is on that drive.  I'd like to make

9   arrangements to get that drive tomorrow.  I don't want any

10  more time to pass.  And you really need to safeguard that.

11  A.    You got it.

12  Q.    Okay.  I'll work that out with my attorney and we'll get

13  it.  I assume we'll need to make -- does your -- we can make

14  arrangements with your attorney but to make sure that your

15  attorney has a copy of the documents as well.

16          MR. ROSEN:  Copy of what documents?

17          MS. O'TOOLE:  I'm sorry, a copy of the drive.  The

18  documents are on the drive.  I used the word too loosely.

19  It's the drive.

20          MR. D'ALESSIO:  So I'm going to give you the drive.

21          MS. O'TOOLE:  Well, we'll make arrangements.  Sal

22  and Sandy can figure out how we exactly want to do it.  Okay?

23  And for --

24          MR. ROSEN:  [Inaudible].

25          MS. O'TOOLE:  Well, I'll ask it but I think he said

29

1  they're destroyed.

2  Q.   But are there any computers left in that space?

3  A.   To my knowledge, there's nothing in the space.

4  Q.   And who was the landlord there?

5  A.   Julio Monaco.

6  Q.   Julio Monaco?

7  A.   Monaco.

8  Q.   Does he own the building?

9  A.   Yes.

10  Q.   And that was a commercial space.  Was there any

11  residential --

12  A.   Commercial.

13  Q.   Okay.  Is there any reason that you used that space as

14  your home address on your personal tax returns?

15  A.   I use it on everything.

16  Q.   When your tax returns called for your home address, you

17  indicated that your home address was 12 Water Street, Suite

18  204, is that right?

19  A.   Correct.

20  Q.   And there was no reason for that?  You just used it for

21  everything?

22  A.   I used it for everything.

23  Q.   Did your wife, and for convenience we'll refer to her as

24  Yvonne because you have another ex-wife as well --

25  A.   I have two ex-wives.

30

1   Q.   Okay.  And as long as we're getting to that, did there

2   come a time when you were divorced from Yvonne?

3   A.   Yes.

4   Q.   And did that occur in or about January of this year?

5   A.   I believe it was December.

6   Q.   Again?

7   A.   I think it was December.

8   Q.   Okay.  Well, would it refresh your recollection if the

9   judgment of divorce was shown to you?  Do you recognize that,

10  sir?

11  A.   Yes.

12  Q.   And does that refresh your recollection as to when the

13  divorce was -- the judgment of divorce was entered?

14  A.   I see December 20th and I see January 24th.

15  Q.   Okay.  All right.  So you are correct.  It looks like it

16  was received December 20th but filed January 24th.  Is that when

17  the judge entered it?

18  A.   I have no idea.

19          MS. O'TOOLE:  I'm just going to mark this as

20  Trustee's Exhibit Number 2 because I showed it to you.

21  Q.   Do you recognize this document?  Have you seen it before?

22  A.   Yes.

23  Q.   And did there come a point in time when you started to

24  live separately from Yvonne?

25  A.   Yes.

31

1    Q.    And when was that?

2    A.    It was probably October, November.

3    Q.    And did you move out of the marital residence or did she?

4    A.    She moved out and -- we both moved out.

5    Q.    And the marital residence that we're referring to is

6    property at 1 Katsura Drive in Purchase?  Is that correct?

7    A.    Correct.

8    Q.    And you say you both moved out?

9    A.    Yes.

10   Q.    When did you both move out?

11   A.    I don't know the dates.

12   Q.    And the marital residence was held in an LLC called

13   Katsura Consulting Group, LLC?

14   A.    Correct.

15   Q.    And you had a 99 percent interest in that entity and she

16   had a 1 percent interest in that entity?

17   A.    Correct.

18   Q.    Did you have a prenup agreement with your wife?

19   A.    Yes, I did.

20   Q.    And the wife, I should be clear, is Yvonne?

21   A.    Ex-wife.

22   Q.    The ex-wife is Yvonne, is that correct?

23   A.    Correct.

24   Q.    And did you -- was there a modification to the prenup

25   when you sought the judgment of divorce?

32

1   A.    No.

2   Q.    When you originally had a prenup was the form of the

3   separation and divorce agreement attached to the original

4   prenup?

5   A.    The prenup was done --

6   Q.    In or about 2005, correct?

7   A.    Approximately 13 years ago.  I don't know.

8   Q.    Okay.  And --

9   A.    It was never modified.

10  Q.    The prenup was never modified?

11  A.    No.

12  Q.    So your current support is --

13  A.    As far as I know it was never modified.

14  Q.    Okay.  And you were represented by Aronson Mayefsky Sloan

15  --

16  A.    Yes.

17  Q.    -- with the prenup, is that correct?

18  A.    Correct.

19  Q.    And you were represented by the successor firm of

20  Sheresky Aronson and May -- I don't know how to say the guy's

21  name necessarily, in connection with your divorce from Yvonne,

22  is that correct?

23  A.    Correct.

24  Q.    There's also Scott Consults 2, LLC is one of your

25  entities, is that correct?

33

1   A.   Yes.

2   Q.   And you have 99 percent interest in that and your wife

3   had a 1 percent interest in that as well?

4   A.   I am not sure about that.

5   Q.   Did there come a point when the property at 20 Scott

6   Circle in Purchase was sold?

7   A.   Yes.

8   Q.   And was that sold in or about December 15, 2017?

9   A.   I don't know the date but --

10   Q.   And there were net proceeds from that sale, correct?

11   A.   Correct.

12   Q.   As a result, those net proceeds, were those -- did your

13   wife receive those?  Ex-wife, Yvonne?

14   A.   Yvonne, yes.

15   Q.   Okay.  And then there is also -- okay.  Did there come a

16   time when you sold property located at 2701 North Ocean

17   Boulevard, Unit 1203 in Boca Raton?

18   A.   Yes.

19   Q.   And what entity held that?

20   A.   I don't know.  Something with the name on it I'm sure.

21   Q.   Was it 2667 North Ocean Boulevard 1203, LLC?  Yes?

22   A.   Sounds like it.

23   Q.   That closed fairly recently April 6, 2018, is that

24   correct?

25   A.   Yes.

34

1          MS. O'TOOLE:  I'm making a demand for the closing

2     statement relating to the closing on that property.

3     Q.    Were there any net proceeds from the sale of that

4     property?

5     A.    Yes.

6     Q.    And what were the net proceeds from the sale of the

7     property?

8     A.    I don't recall.

9     Q.    Would they be reflected in the closing statement?

10    A.    Yes.

11    Q.    And were the proceeds put in an attorney escrow account

12    or were they transferred to some bank account held by an LLC?

13    A.    They were ultimately transferred to me.

14    Q.    Okay.  And how much did you receive?

15    A.    I don't remember the amount.

16    Q.    Was it over 100,000?

17    A.    Yes.

18    Q.    And was it over 200,000?

19    A.    Yes.

20    Q.    Was it over 300,000?

21    A.    Yes.

22    Q.    Was it over 400,000?

23    A.    I don't know.

24    Q.    And so when you say they were ultimately transferred to

25    you, were they put in a bank account in your own name?

35

1  A.    I believe so.

2  Q.    And where was that bank account?  What bank is that

3  account?

4  A.    I don't know which bank account.

5  Q.    Okay.  And --

6  A.    I have over 100 companies so you have to excuse me.

7  Q.    Okay.  Was it put in a corporate account or an individual

8  account?

9  A.    I have no recollection.

10  Q.    Okay.

11  A.    But it was put into a bank account.

12        MS. O'TOOLE:  All right.  So I'm going to make

13  demand --

14        MR. D'ALESSIO:  It's all on the hard drive.

15  Q.    It's on the hard drive but you're going to have to give

16  me a little bit of a cookie trail to find it.  Okay?  So this

17  closing just occurred within the last two months about.  It's

18  a good amount of money from a guy who apparently doesn't have

19  much money right now.

20  A.    Right.

21  Q.    So you're going to try to recall where you put the money,

22  what bank --

23  A.    I spent the money.  That's what I lived on.

24  Q.    Okay.  So then you do know the answer.

25  A.    I can answer the questions.

36

1   Q.   You do know the answer but I want to see the

2   documentation.

3   A.   Absolutely.

4   Q.   So I'm asking you for the bank statement, where the money

5   was deposited?

6   A.   Fine.

7   Q.   Okay?  And the documents or the bank trail that will show

8   me how it was spent.  Okay?

9   A.   Absolutely.

10  Q.   Was any of the money from that sale used to pay your

11  attorney in this bankruptcy case?

12  A.   I don't recall.  I don't believe so.

13  Q.   Okay.  So on your bankruptcy petition do you recall that

14  you indicated that you paid your attorney, your attorney's

15  fee?

16  A.   Yes.

17  Q.   And did you indicate that you paid the fee, not some

18  other person paid the fee?

19  A.   Yes.

20  Q.   And where did you pay that money from?

21  A.   I borrowed funds from family members.

22  Q.   And what family members did you borrow the funds from?

23  A.   My mother, my father, and my brother.

24  Q.   Okay.  And I'm showing you a copy -- I'll just open the

25  book and show you.  It's document number 24, disclosure of

37

1   compensation of attorney for the debtor.  Do you recall that

2   document, sir?

3   A.    Yes.

4   Q.    And on that document it's Page 382 of 383, it reflects

5   that legal fees of $120,000 were paid, is that correct?

6   A.    Correct.

7   Q.    And is that in fact the truth that amount was paid --

8   A.    Correct.

9   Q.    -- to your attorney?  Separately it indicates the source

10  of the compensation paid to me was, and it says debtor,

11  correct?

12  A.    Correct.

13  Q.    And you paid counsel for those, the 125, is that right?

14  A.    Correct.

15  Q.    Is it your testimony now that that money came from a

16  family member?

17  A.    No, I paid it.  The money --

18  Q.    Okay.

19  A.    I borrowed money from family members.

20  Q.    All right.  Are there notes that reflect that you

21  borrowed the money from your family members?

22  A.    There's a trail.  We can give you the documentation.

23  Q.    So that's what I'm asking.  So far we have what happened

24  to the money from the sale of the Florida property and we're

25  referring to unit 1203 in Boca Raton.  You know the unit I'm

38

1   referring to, correct?

2   A.   Yes.

3   Q.   So you're going to give me the closing statement and

4   you're going to show me where that money was deposited and how

5   was it expended.   Next you're going to provide the

6   documentation that reflects the money that you borrowed from

7   your family.   Did you deposit that into a bank account?

8   A.   I borrowed numerous times over the last several months.

9   So money was either deposited into a debit account, a bank

10  account.   And I also borrowed a credit card.

11  Q.   You borrowed a credit card from who?

12  A.   I got a credit card, my mother got me a credit card on

13  her account.

14  Q.   Okay.   At the end of the day we're going to request the

15  bank accounts, a comprehensive list of any and all bank

16  accounts in which you have signatory authority.

17  A.   That's fine.

18  Q.   I know that's going to be an exhaustive list.   Right now

19  what I'm saying to you is I want a copy of any and all bank

20  accounts -- not a copy.   A list of any and all accounts in

21  your individual name.   Do you have accounts in your individual

22  name?

23  A.   They're in there.

24  Q.   And in there you're saying in the bankruptcy petition, is

25  that correct?

39

1  A.    Yes.   Correct.

2  Q.    And then there are certain accounts for which I was made

3  -- certain bank statements were made available to me through

4  your counsel already.  Do you recall if the money --

5  withdrawn.  If you need money today, what bank account are you

6  going to?

7  A.    I have no --

8  Q.    Personally.

9  A.    I have no bank accounts as of today.  I have a debit

10  card, a credit card.

11  Q.    And whose -- what account are you debiting from when you

12  use the debit card?

13  A.    An account in Capital One that was opened, I don't know,

14  a couple of weeks ago.

15  Q.    What's the name on the account?

16  A.    Michael P. D'Alessio.

17  Q.    So you do have a bank account that you can use a debit

18  card?

19  A.    That's after the bankruptcy.

20  Q.    Right.  So my question was what would you do today if you

21  wanted a cup of coffee and you didn't have any money?  You'd

22  use a debit card for an account that's at Capital One.

23  A.    Correct.

24  Q.    Is that right?

25  A.    Correct.

40

1  Q.    And has anybody been transferring money into that account

2  for you?

3  A.    Yes.

4  Q.    And who's been doing that?

5  A.    My mother and father and my brother.

6  Q.    Prior to the bankruptcy filing, you also repaid Irene and

7  Ronald D'Alessio certain monies, is that correct?

8  A.    Correct.

9  Q.    And is Ronald the name of your brother and a father or --

10 A.    Yes.

11 Q.    So I'm showing you Page 364 of the bankruptcy petition.

12 It indicates that you paid Irene and Ronald D'Alessio 200,000

13 on or about May 5, 2017.  Do you see that?

14 A.    Correct.

15 Q.    And then you also paid Ronald D'Alessio 50,000 on or

16 about March 27, 2018, is that correct?

17 A.    Correct.

18 Q.    Did any of the 50,000 come from the sale of the Boca

19 Raton unit that we were just discussing?

20 A.    I have no idea.  Money is fungible so --

21 Q.    Well, it's also traceable and --

22 A.    I have no idea.  It's traceable.

23 Q.    -- that's what I'm trying to do.  Okay?

24 A.    We'll trace it.

25 Q.    So my question to you is did you give Ronald D'Alessio

41

1  any money to hold for you while you're in bankruptcy?

2  A.   No.

3  Q.   And you don't know the source of the 50,000 that you used

4  to pay, repay your brother, Ronald D'Alessio, based on his

5  membership interest in Shrut's [Ph.] Avenue Development?

6  A.   I don't.

7  Q.   Next we have another payment to Ronald D'Alessio a

8  50,000.   It seems to be the same date and the same amount of

9  money.   Did you make on the same date two payments to your

10  brother of $50,000?

11  A.   Yes.

12  Q.   And why did you make two payments on the same date to

13  your brother?  Do you know, sir?

14  A.   No.

15  Q.   You have a --

16  A.   I got a feeling that this may not be correct.

17  Q.   That you made two payments or that you made one?

18  A.   I believe I received money, not that I paid money.

19  Q.   Do you know if this payment was the day before the TRO

20  was entered?

21  A.   I have no idea.

22  Q.   But as you sit here today you're not sure if the petition

23  and the schedules that you filed are correct that you paid

24  your brother?

25  A.   I don't know if I paid him or he paid me.  On that

42

1  schedule it looks like he paid me.

2  Q.   Does Katsura Consulting Group, LLC hold any other

3  property?

4  A.   No.

5  Q.   And does Scott Consulting 2, LLC hold any other property?

6  A.   No.

7  Q.   And I should say other than what we've discussed in

8  Purchase and the property -- the two properties are in

9  Purchase, correct?

10  A.   No.  Yeah.

11  Q.   There's currently a contract for sale for the property at

12  1 Katsura Drive, is that correct?

13  A.   There was.  I don't know if it is -- it's been very

14  confusing.  I don't know if it's null and void now.

15  Q.   In connection with the prenup you had signed prior to

16  getting married you had agreed to provide your now ex-wife

17  Yvonne $600,000, is that correct?  For -- unrelated to child

18  support.  Was that what the prenup was?

19  A.   I think I owe her more than that.

20  Q.   Under the prenup that you signed when --

21  A.   I think under the prenup I owe her almost $1 million.

22  Q.   And most recently did you cause a new separation

23  agreement, an agreement and stipulation of settlement to be

24  executed?

25          MR. ROSEN:  What do you mean new?

43

1        MS. O'TOOLE:  Withdrawn.

2   Q.   I'm just going to -- I'll show you.  Did you have an

3   agreement and stipulation of settlement by and between Yvonne

4   D'Alessio and Michael D'Alessio?

5   A.   Yes.

6   Q.   Do you recall that?

7   A.   Yes.

8   Q.   And do you know when that was signed?

9   A.   I don't.

10  Q.   Would it refresh your recollection, I can show you the

11  page, that it was in or about January of 2018?  Does that

12  refresh your recollection?

13  A.   If I see the date, yeah.

14  Q.   I actually am incorrect.  It was December.

15  A.   That's why I'm confused.

16  Q.   Yeah.  Could you agree at the end of the year and then

17  the judgment gets entered in January?  Does that --

18  A.   It was the 18th of December it was signed.

19  Q.   Okay.  All right.  And as a result of that, your wife

20  received the 191,150 as a result of the sale of the Scott

21  Circle property, right?

22  A.   She received the interest on two properties in the Bronx.

23  Q.   So that's a little different.  She received -- the

24  property was sold December 15, 2017 and from the net proceeds

25  the sale of 20 Scott Circle she received $191,150, right?

44

1   A.   I have no idea, but whatever the proceeds were, she

2   received.

3            MS.  O'TOOLE:  And I may have said it already but I

4   am requesting the closing statements for the Scott Consult.

5            MR. ROSEN:  Is it on the drive?

6            MS. O'TOOLE:  On the what?

7            MR. ROSEN:  Is it on the drive?

8   Q.   Is it on the drive?

9   A.   Yeah.  Let me -- can I ask a question?

10  Q.   What lawyer closed that?

11  A.   It's all on the drive and it's very organized.

12  Q.   Okay.

13  A.   You go to the address --

14  Q.   That's super.

15  A.   -- all the documents are there.

16  Q.   And if it's all there, we'll try to find it.

17  A.   Do you want me to produce hard copies as well?

18  Q.   If it's all on the drive --

19  A.   It's all on the drive.

20  Q.   -- when we get the drive tomorrow and obviously in

21  consultation with your lawyer, you know, we may need you to

22  isolate where things are, what we're looking for because it

23  seems that it would be a lot of documents.

24  A.   I can send Rita to your office.

25  Q.   Okay.  Rita sounds like a good resource so I would like

45

1  to meet Rita.  And then there's also as part of the divorce,

2  the stipulation, agreement and stipulation of settlement you

3  granted your wife a second mortgage in the property located at

4  1 Katsura Drive in the amount of $970,000, is that correct?

5  A.   Correct.

6  Q.   And then separately in connection with the child support

7  payments you granted her interest in 3200 and 3600 Tremont?

8  A.   Correct.

9  Q.   And as part of the agreement and stipulation of

10  settlement, you recited that the equity in that property was

11  about $2 million at the time that you agreed that you would

12  give her that interest in lieu of child support, is that

13  correct?

14  A.   Correct.

15  Q.   What I would ask you for or direct us to is any

16  information with respect to the value and the tax basis in the

17  property located at 1 Katsura Drive.  Is that going to be on

18  the drive?

19  A.   So it's going to be on the hard drive.  You'll have an

20  appraisal from the bank.  You'll have a bank appraisal for all

21  the properties.

22  Q.   Did you both obtain appraisals or did you agree to one

23  appraisal?

24  A.   No, neither one of us did.  We had an appraiser when we

25  took the loan or when I took the loan.

46

1  Q.    Yes.

2  A.    An appraisal was done.

3  Q.    And then there was an agreement that she would get 40

4  percent of the proceeds and you would get 60 percent of the

5  proceeds from the sale of the Katsura property, correct?

6  A.    Right.

7  Q.    And then from your 60 percent she would get a portion of

8  that to be applied to the 600,000?

9  A.    Or 900,000.  900 and change.  You're taking 200 off from

10  --

11  Q.    So she has a mortgage against 1 Katsura Drive of 970,000

12  right?

13  A.    Correct.

14  Q.    And she also received the 191,150?

15  A.    So I think that comes off the 900.

16  Q.    That comes off the 900?

17  A.    I believe so.

18  Q.    So here's where I need your help and you may not know the

19  answer today.  In the original prenup she was supposed to get

20  a lump sum of 600 but you indicated I could be mistaken on

21  that.  If there's somewhere else in the prenup that it

22  suggests she was most to get a higher amount, if you through

23  counsel could point that out to me.  Then I fast forward to

24  the agreement and the stipulation and it looks like she gets

25  191 and then she gets the secured mortgage of 970, right?

47

1   Against 1 Katsura Drive.

2   A.    Right.

3   Q.    And she gets 40 percent of the marital residence,

4   correct?

5   A.    Correct.

6   Q.    So it seems to exceed 600 but I'm happy to have you tell

7   me where I'm missing on the math.

8   A.    That's fine.

9   Q.    Okay?

10  A.    It's going to be a moot point because the value is not

11  there.  The value of the -- I think we had a contract of sale

12  for 3.2.

13  Q.    Yes.

14  A.    And the mortgage is more than the 2.6.

15  Q.    So the equity there is about 500 maybe.

16  A.    Minus a broker fee of 250.

17  Q.    Let me backtrack a little bit.  When you transferred the

18  interests, the 3200 and 3600 Tremont, the equity -- I'm going

19  to withdraw and ask a better question.  As part of the

20  agreement you gave to her in lieu of child support the equity

21  in 3200 and 3600 Tremont, correct?

22  A.    Correct.

23  Q.    Which is held through certain LLCs, is that right?

24  A.    Correct.

25  Q.    When you did that, did you pay down the mortgage before

48

1  you transferred it, the equity to Yvonne?

2  A.    We both paid down part of the -- there was a mezz loan.

3  Q.    And where did the funds come to pay down the mezz loan?

4  A.    Part of it came from her and part of it came from me.   I

5  don't know where the money came from.

6  Q.    What was the amount of the mezz loan?  Will that be

7  reflected in the closing?

8  A.    Yes.

9  Q.    Well, wait a minute.  There's not going to be a closing

10  because that was part of the agreement in the stipulation of

11  settlement.  So I'm requesting any and all documents.  And

12  again, if you can pinpoint them on the hard drive --

13  A.    Yes, ma'am.

14  Q.    -- evidence of how much was paid down on the mortgage for

15  3200 and 3600 Tremont before that interest was transferred to

16  Yvonne.

17  A.    Okay.

18  Q.    Do you know who was the mezz lender?

19  A.    Throgs Neck Debt or Bluestone.  They have two names.

20  They still have -- there was a mezz loan blanketing my Bronx

21  portfolio and they still have a mezz position on the rest of

22  the stuff in the Bronx.

23  Q.    Now were any of the -- in the various LLCs, were any of

24  these CMBS loans?

25  A.    What's that?

49

1   Q.    Were they commercial mortgage backed securities at all?

2   A.    No.

3   Q.    No.  Okay.  And prior to the marriage as part of the

4   prenup you had delineated the interest that you had in your

5   property held through LLCs, is that right?

6   A.    Correct.

7   Q.    And 3200 and 3600 you held prior to the marriage,

8   correct?

9   A.    True.

10  Q.    And your wife also had interest in real property that she

11  held prior to the marriage, is that correct?

12  A.    Correct.

13  Q.    And she held them through YCS Equity, is that right?

14  A.    I'm not sure.  She had her own assets and I had my own

15  assets.

16  Q.    And that's why the prenup gave a lump sum of a certain

17  amount, I'm not sure we agree on the amount, that she would

18  get upon --

19  A.    The amount she got is actually less than the calculation,

20  the child support calculation.

21  Q.    Is there a document where you set that out or did your

22  lawyer set that out?

23  A.    The lawyers did that.

24  Q.    And did you -- was there a financial statement prepared

25  by each of you in connection with the divorce that occurred in

50

1  or about December or January?

2  A.    I don't know.

3  Q.    How did you arrive at the value to do those calculations

4  under the prenup?

5  A.    I know the values of the assets but --

6  Q.    How did you convey that to your attorney?  Verbally?

7  A.    Yes.

8  Q.    And how did she convey --

9  A.    Also I have appraisers.  We had appraisers.

10 Q.    Okay.  Now, there's also an insurance trust, is that

11 right?

12 A.    Excuse me.  The appraisals weren't done as part of the

13 divorce.

14 Q.    Right, the appraisals --

15 A.    The appraisals existed, and you'll have access to them,

16 because I refinanced like a year before.  So you'll have

17 current appraisals.

18 Q.    And when you refinanced in the property we're discussing,

19 are we both -- the Purchase properties, there's two, Scott and

20 Katsura?

21 A.    I'm talking more about the bonds.

22 Q.    Okay.  The bonds?  And when you refinanced 3200 and 3600

23 Tremont Avenue, did you take cash out?

24 A.    Yes.  I took -- I think the mezz loan was 3 million,

25 maybe more.

51

1   Q.    What happened with that 3 million?

2   A.    I took that mezz loan to pay investors.   I mortgaged my

3   personal portfolio and used that money to pay investors.

4   Q.    And then there came a time when you entered into an

5   agreement with the bond where you paid that mezz debt down?

6   A.    Subject to in accordance with the agreement, the divorce

7   agreement.

8   Q.    Okay.  But it was a mezz debt of 3 million you thought?

9   A.    No.

10  Q.    No.  Okay.

11  A.    I paid down --

12  Q.    Okay.

13  A.    I want to think maybe I paid down about 800,000.

14  Q.    All right.  There's so much to go through, we're not

15  going to get through everything today.  Let me hit upon a few

16  other things.  There's an insurance trust, a Michael P.

17  D'Alessio 2013 YMGB insurance trust?

18  A.    Yes.

19  Q.    I'm going to -- withdrawn.  What are the assets of that

20  trust?

21  A.    There are none.

22  Q.    Is there a term life insurance policy?

23  A.    Is term the one you pay every year?

24  Q.    Well, most insurance you pay annually.  The question is

25  whether it's whole life or just upon death.

52

1   A.   If it doesn't get paid in the next couple of days --

2   Q.   You don't have a policy.

3   A.   -- we don't have a policy.

4   Q.   And more importantly, is the benefit only upon death?

5   A.   Yes.

6   Q.   It's not a whole life policy?

7   A.   It's worth nothing.

8   Q.   You're certain it's --

9   A.   Positive.

10  Q.   Okay.  Then there's -- are there any other assets in that

11  trust?

12  A.   No assets.

13  Q.   And Barry H. Mandel is the trustee --

14  A.   Yes.

15  Q.   -- with Yvonne?

16  A.   Yes.

17  Q.   And in the context of the divorce was Yvonne removed as a

18  trustee?

19  A.   I don't know.

20  Q.   And then you have the Michael P. D'Alessio YJJ insurance

21  trust.  Is that right?

22  A.   Yes.

23  Q.   October 4, 2013 that was created.  And what are the

24  assets of that?

25  A.   There's no assets.  None of the trusts have assets.

53

1  Q.    And again, it's $9.3 million worth of term life

2  insurance?  Is that what it is?  Yes?

3  A.    Yes.

4  Q.    How are you paying that premium?

5  A.    It's overdue about 24 days.  If it doesn't get paid,

6  there'll be no insurance.

7  Q.    In the same vein you listed on your bankruptcy petition

8  that you have zero income, is that correct?

9  A.    Correct.

10  Q.    And you have a lease to rent property both in New York

11  and in Florida, is that correct?

12  A.    Correct.

13  Q.    And the lease in New York, the payment is somewhere about

14  $5,663 or something like that, right?

15  A.    Correct.

16  Q.    Are you making that payment?

17  A.    Yes.  It's current.

18  Q.    And how are you making that payment?

19  A.    From friends and family.

20  Q.    And is there a bank account which will reflect how that's

21  paid?

22  A.    I can get you backup to how it's paid.

23  Q.    Do you write a check?

24  A.    I don't do anything so I'll find out.

25  Q.    Who does it?

54

1  A.    Rita.

2  Q.    All right.  So Rita causes the rent to be paid in both

3  Florida and New York?

4  A.    Yeah.

5  Q.    Okay.  You have other -- and what kind of car do you

6  drive?

7  A.    I just leased a GMC Denali.

8  Q.    And who's name -- what entity or individual name is that

9  leased in?

10  A.    I am not sure.

11  Q.    Who knows that?  Rita?

12  A.    Rita.

13  Q.    Did Rita go get the lease for you?

14  A.    She handled it over the phone.

15  Q.    And was it in the name of a business entity?

16  A.    It might be a business entity or it might be --

17  Q.    You have no idea?  I'm going to request a copy of your

18  registration and insurance card for the Denali.

19  A.    Sure.

20  Q.    Do you know where you have car insurance through?

21  A.    No.

22  Q.    All right.  Do you know how much you pay in car

23  insurance?

24  A.    No.

25  Q.    Do you have any of your children on your car insurance?

55

1  A.   No.

2       MR. ROSEN:  What did you say?  You wanted the

3  registration as well?

4       MS. O'TOOLE:  The registration and the insurance

5  card.

6       MR. ROSEN:  Okay.

7  Q.   Pursuant to the divorce you were to stay in the Katsura

8  property until it was sold, is that right?

9  A.   Correct.

10 Q.   So then why did you take out a lease in New York and

11 Florida, in New York at least, in October of 2017?

12 A.   You ever try coming home to a big house with no family in

13 it when your family lived there?

14 Q.   I have not.  But I understand your answer.  I'm going to

15 request a copy of the lease agreement for the car as well.

16 A.   Sure.

17 Q.   There are a couple of different properties I want to

18 touch on.  It's getting short in time before the CSO kicks us

19 out of here.  But there's property in Middle Pond Road?

20 A.   Correct.

21 Q.   Is that in 41, 43, and 45?

22 A.   39, which is a house.

23 Q.   Yes.

24 A.   41, which is a vacant lot; 43, which is a vacant lot; and

25 45, which is a vacant lot.

56

1   Q.   Are those buildable lots the vacant lots?

2   A.   All the lots are buildable.

3   Q.   And the house, was that improved in any way?

4   A.   The house was --

5   Q.   Was there a knock down and build or --

6   A.   No, it was built like a year ago.  It's brand new.

7   Q.   And did you have any contracts of sale with respect to

8   that property?

9   A.   No.  We've been trying to sell it for over a year.

10  Q.   Do you have a broker for that property?

11  A.   We had a broker.

12  Q.   Okay.

13  A.   We let it die out because of the situation.

14  Q.   All right.  And then have you had any expressions of

15  interest?

16  A.   Nothing.

17  Q.   With respect to any of the properties, if anybody

18  expresses any interest, if you'd direct them our way?

19  A.   Absolutely.

20  Q.   I appreciate that.

21  A.   Absolutely.

22  Q.   And then --

23  A.   I have interest -- well, I don't want to take up your

24  time.

25  Q.   Go ahead.

57

1  A.    I have interest in the property in Scarsdale now.

2  Q.    And give us the address on that.

3  A.    1517 Circle Road in Scarsdale.  And it could probably be

4  sold and the investors can get a decent amount of money back

5  on that.

6  Q.    Okay.  So you'll take your legal advice from your lawyer

7  but whatever you can do, whenever there is a property that

8  potentially someone has interest I'm always going to need to

9  know the basis for tax purposes so we can evaluate the

10  implications for the bankruptcy estate.

11  A.    Sure.

12  Q.    And the more of the properties we can sell and liquidate

13  for the benefit of creditors I suspect might enure to your

14  benefit.  So for each of them I would just ask you to keep

15  that in mind.

16  A.    Sure.  There's not many because in most cases you're

17  going to find the mortgage is more than the value of the

18  property.

19  Q.    And how did that come to pass?

20  A.    The market.  That's how this all happened.

21  Q.    How about Sandpiper?

22  A.    Sandpiper is a buildable lot.

23  Q.    And what's the exact address for the record?

24  A.    3 Sandpiper Court.

25  Q.    And that's Westhampton?

58

1  A.    Westhampton.

2          MR. ROSEN:  Is there a house on it?

3          MR. D'ALESSIO:  No.  There was a house when we

4  bought it.  We knocked it down and got approval for another

5  house.  It's approved and ready to go.

6  Q.    How about the property, personal property held in Ski You

7  Later, Inc.?

8  A.    It's a boat and a jetski I believe.

9  Q.    What's the boat.  What kind of boat?

10 A.    I think a 19 or 20 foot like day rider.  Something to

11 jetski, water ski on.  Small boat.

12 Q.    So they're both jetskis?

13 A.    One's a jetski --

14         MR. ROSEN:  One's a boat.

15 A.    -- and one's like a jet boat.

16 Q.    And how much did you pay for those?

17 A.    I have no idea.

18 Q.    And who are the shareholders of that corporation?

19 A.    Just me.

20 Q.    And when did you purchase the jet boat and the jetski?

21 A.    Probably two years ago.

22 Q.    And where are they located?

23 A.    In Hampton Bays.

24 Q.    And at a particular marina?

25 A.    The marina.  At the marina that I bought it at.

59

1   Q.    And what marina is that?

2   A.    I don't know.  Maybe it's Hampton Bays Marina.  You'll

3   have all that information.  I'll get you everything.

4           MR. ROSEN:  Hampton Watercraft?

5           MR. D'ALESSIO:  I'm sorry?

6   Q.    Hampton Watercraft?

7   A.    Is the name of it Watercraft?  I don't know.  But again,

8   on the hard drive there'll be everything.

9   Q.    You have listed on the bankruptcy petition, Page 2,

10  $7,200 that's paid to you first ex-wife, is that correct?

11  A.    Yes.  I think I only owe her 3,600 now.

12  Q.    So there is a conflict between this page and then I think

13  it's schedule -- your expense schedule, J, right?

14  A.    So by the time we come back here she'll be paid in full

15  because her last payment is this month.

16  Q.    So you're just about done?

17  A.    Yes.

18  Q.    Because your children have reached majority?

19  A.    My --

20  Q.    Is that alimony or --

21  A.    Yeah.  My third one just graduated last week.

22  Q.    Okay.  And then so the cars and any water craft on your

23  petition, you indicate you have none, but they would be held

24  indirectly through corporate entities, is that correct?

25  A.    I don't have many automobiles.  I have the two water

60

1  craft.

2  Q.   And is the only motor vehicle available to you to drive

3  the Denali?

4  A.   Yes.

5  Q.   And that is pursuant to a lease through some entity but

6  we're not sure what?

7  A.   Right.  And it's a brand new lease from last month.

8  Q.   And what were you driving two months ago?

9  A.   I had a Mercedes and a Denali.

10  Q.   And what happened to the --

11  A.   They were all leases.  I had a Mercedes, a Denali, and an

12  Infinity and I returned them all.

13  Q.   And were those leases in the name of corporate entities

14  or you individually?

15  A.   Both individually and corporate.

16  Q.   And then can you describe the jewelry that you own?

17  A.   I have three watches.

18  Q.   And what was the most expensive one?  How much was the

19  Rolex?

20  A.   I'm going to say it's probably worth a couple of thousand

21  dollars.

22  Q.   I'm going to request a copy of the homeowners policy for

23  the marital home, particularly any riders on it inclusive for

24  the last five years, whatever riders were.  Okay?

25  A.   I'll give that to you.  The only jewelry on it is her

61

1   when we were married, her wedding ring.  There's nothing else

2   on it.  I'll give it to you.

3   Q.   And then on your bankruptcy petition Page Number 5 at the

4   time that you prepared this schedule which was May 30th, you

5   indicated that you had no cash, is that correct?

6   A.   Correct.

7   Q.   And is it because you never have cash, that it's through

8   different entities that you access money?

9   A.   Basically.

10  Q.   All right.  And then you had no money in any checking,

11  savings, or other financial accounts at the date you prepared

12  these schedules?

13  A.   Correct.

14  Q.   And that's because any checking or savings is through an

15  entity?

16  A.   Whatever was personal I took out.

17  Q.   And when did you take it out?

18  A.   It's in there.  I listed the bank accounts.

19  Q.   Do you hold any bonds, mutual funds, or publically traded

20  stock?

21  A.   No.

22  Q.   Have you ever?

23  A.   No.  I have no investments, securities, retirement.

24  Q.   And your landlord is Townhouse Company 2, LLC.  Is that

25  correct?

62

1   A.    That's Manhattan, yes.

2   Q.    Do you have any interest directly or indirectly in that

3   entity or the building?

4   A.    I wish.

5   Q.    Then you have indicated in response to question number 31

6   interest in insurance policies, you indicated no.

7   A.    Correct.

8   Q.    And that's because whatever insurance policies are held

9   through trusts, is that correct?

10  A.    Correct.

11  Q.    On the list of corporations and LLCs you indicate, and I

12  can show you, it's Page 8 of your petition, the value, the

13  approximate value of 39 Middle Pond is 600,000, is that

14  correct?

15  A.    The way I came up with that value is I thought the house

16  would transfer for about 4 million.  There's a $3 million

17  mortgage on it.  If you take the broker fee and the closing

18  costs you would end up with 600,000.  But we have never got an

19  offer and it's been on the market for a year.

20  Q.    So when you put approximate values on the list of

21  corporations and LLCs which appear on your petition Pages 8

22  and 9, you gave net values, not gross --

23  A.    Correct.

24  Q.    -- that something could be sold for.

25  A.    Correct.

63

1    Q.    And when you did that for Katsura Consulting Group, LLC,

2    you indicated its value was zero?

3    A.    Yes.

4    Q.    Is that because it was encumbered by the second mortgage

5    to your wife Yvonne, ex-wife Yvonne?

6    A.    Correct.

7              MR. ROSEN:   And the first.

8    A.    Correct.

9    Q.    And the first of course as well, yes.

10   A.    But even if you take Yvonne's security out of it, once

11   you -- if you honor the contract at three two, which is

12   market, there's a two six mortgage plus penalties and

13   interest, probably two seven now.  There's 230 or $50,000

14   broker fee.  You end up with -- I think she ends up with like

15   $40,000.

16   Q.    So you made a good deal, is that what you're saying?

17   A.    The market is terrible.

18   Q.    Well, a little bit of levity --

19   A.    The market's terrible.

20   Q.    -- but when you did your stipulation and agreement of

21   divorce, you're saying you gave her a mortgage for 970 that

22   may be worth 40,000?  Is that what you're saying.

23   A.    No.  If you asked me what the house was worth two years

24   ago, I would have told you I could sell it for three nine.

25   Q.    How about three months ago or five months ago when you

64

1  did the stipulation and divorce?

2  A.   I still thought I would get more than three two.

3  Q.   Okay.  And when was the contract signed?

4  A.   If you look at the listing, you'll see we started at

5  three nine, or three seven, three eight.

6         MR. LaMONICA:  I don't get the numbers.  First is

7  two seven.

8         MS. O'TOOLE:  Just for the record, it's Salvatore

9  LaMonica, trustee's counsel, speaking.

10         MR. LaMONICA:  It says 270, the broker's 250.

11         MR. D'ALESSIO:  Closing costs.  The taxes

12  [inaudible] probably.  The taxes are 70,000.

13         MR. LaMONICA:  70?  That's [inaudible].  Okay.  Is

14  it insured that home?

15         MR. D'ALESSIO:  Yes.

16  Q.   Showing you Page 22 of the bankruptcy petition.  There is

17  reference to an auto lease, Michael Paul Enterprises through

18  Ally.  Do you recognize that on Page 22 of the petition?  And

19  what auto is that for?  Is that the one you surrendered?

20  A.   I don't know but it's one of the ones I surrendered.  I

21  can't tell you which one.

22  Q.   And Michael Paul Enterprises, would you describe that as

23  the operating company for --

24  A.   It's the general contractor, a parent -- not really a

25  parent company but it's my main company.

65

1   Q.   And how much are you currently paying for rent in

2   Florida?

3   A.   I want to say about 4,000 a month.

4   Q.   And why do you have a place in Florida and New York?

5   A.   Cause I'm probably going to leave New York.

6   Q.   And that's what you indicated in the agreement and the

7   settlement in the context of the divorce that you were heading

8   to Florida, is that correct?  Yes?

9   A.   I don't know if I'm going to go to Florida or not but I

10  wanted to try Florida out.

11  Q.   So you don't have any income reflected on your bankruptcy

12  petition but you have a lease in New York and a lease in

13  Florida.

14  A.   Correct.

15  Q.   And it's your testimony that somebody else is paying

16  those amounts?

17  A.   I'm paying them but I borrow the money.

18  Q.   And you're borrowing those from family members or from

19  any of these corporate entities?

20  A.   No, no, no.  Strictly my family.

21  Q.   And are your family members investors in any of your

22  LLCs?

23  A.   Yes.

24  Q.   And is any of the money that your family is paying to you

25  money that they made off of the investments in the LLCs?

66

1  A.    No.

2  Q.    Okay.  And --

3  A.    For the record, my family -- I lost my parents'

4  retirement and my kids', all my kids' money, all the kids'

5  money.

6  Q.    All I'm doing is asking questions today.  I'm not

7  reaching any conclusion.

8  A.    I understand.

9  Q.    And if it's all in the hard drive --

10  A.    It's all on the hard drive.

11  Q.    -- I'll look at it and get eyesore.  That's what will

12  happen, okay?

13  A.    Very clean records.

14  Q.    All right.  So now referring to Schedule J of your

15  bankruptcy petition, this is maybe what you were referring to

16  that you wanted to correct.  I don't know.

17  A.    Yes.

18  Q.    At the beginning of the petition it indicates a DSO of

19  $7,200, is that correct?  When we were at the --

20  A.    Correct.

21  Q.    Okay.  But you're saying that your last payment is 3,600

22  and this will be the last month that you have to make a

23  payment?

24  A.    Like by next month down to zero.

25          MR. ROSEN:  You're amazing.

67

1          MS. O'TOOLE:  I like you too, Sanford.

2          MR. ROSEN:  Right?  I've never seen anything like

3  this.  Very efficient.

4          MS. O'TOOLE:  I'm like Rita I think.

5          MR. ROSEN:  Huh?

6          MS. O'TOOLE:  I'm joking.  I said I'm like Rita I

7  think.  I'm only joking.

8          MR. D'ALESSIO:  Rita's the best.

9          MS. O'TOOLE:  Rita sounds pretty darn good.

10  Q.   Okay.  So we will -- I should ask, and I might have, but

11  any safe deposits?

12  A.   No.  That's what I wanted to --

13  Q.   There you go.

14  A.   That's what I wanted to correct.

15  Q.   This is what I wanted to ask you.

16  A.   It says yes.

17  Q.   You have five safe deposit boxes.

18  A.   I have no -- I gave the keys back to the bank.

19  Q.   Why would you have had five safe --

20  A.   Because every time I opened an account in the bank, I

21  open a safe deposit box as well.

22  Q.   Have you ever had anything in your safe deposit boxes?

23  A.   Very rarely over the years.

24  Q.   And what would you have in there?

25  A.   From time to time I might have had a watch in there or

68

1    some cash.

2    Q.    And then you did respond to the statement of financial

3    affairs question number 28 that you were provided a financial

4    statement to the Westchester bank?

5    A.    Yes.

6    Q.    I'm going to make demand for that.  And of course if it's

7    in the hard drive you'll locate where I should be looking for

8    it to get it.  When did you submit that financial statement?

9    A.    I don't recall the date.

10   Q.    But it was within the last two years?

11   A.    Oh, yeah.

12   Q.    So that's you individually.  As a member of any of the

13   LLCs or shareholder of the corporations or officers had you

14   submitted financial statements to banks as well?

15   A.    Correct.

16   Q.    And are those going to be in the hard drive that you're

17   going to provide to us?

18   A.    Everything.

19          MS. O'TOOLE:  I have no further questions at this

20   point.  Obviously, there's a limited opportunity if anybody

21   wants to ask --

22          MS. KIRBY:  I have a very short --

23          MS. O'TOOLE:  Okay.

24   BY MS. KIRBY:

25   Q.    I'm Dawn Kirby.  I represent Attis Properties.  Hi.  Do

69

1  you have a passport?

2  A.    Yes.

3  Q.    Where do you keep it?

4  A.    In my bag.

5  Q.    What bag?

6  A.    In my backpack.

7  Q.    Do you have it on you today?

8  A.    No.

9  Q.    When's the last time you used it?

10  A.    A month or two ago.

11  Q.    Where did you go?

12  A.    Dominican Republic.

13  Q.    And how many times have you been out of the country

14  within the last two years?  Tell me where you've been out of

15  the country in the last two years.

16  A.    I've been to the Dominican Republic probably a half a

17  dozen times.

18  Q.    Anywhere else?

19  A.    I don't think so.

20  Q.    What's the purpose of your trip to the Dominican Republic

21  so many times?

22  A.    I enjoy going there.  Guaranteed weather.

23  Q.    Vacation?  You stay at the same place?

24  A.    I might move there.

25  Q.    Stay at the same place every time?

70

1  A.    No.

2  Q.    Have you ever been to a gambling casino or online

3  gambling in the last year?

4  A.    Yes.

5  Q.    What casinos have you been to?

6  A.    I've been to Hard Rock in the Dominican Republic, Hard

7  Rock in Hollywood.

8  Q.    Hollywood, Florida?

9  A.    Yep.  The Borgata in Atlantic City.

10  Q.    Did you gamble while you were there?

11  A.    Yes.

12  Q.    Did you have any losses?

13  A.    I don't know.

14  Q.    You don't know what happened?

15  A.    No.

16  Q.    Because you --

17  A.    I know I had losses at Borgata.

18  Q.    Okay.  Do you recall was it more than $100?

19  A.    Yes.

20  Q.    More than 1,000?

21  A.    Yes.

22  Q.    More than 10,000?

23  A.    Yes.

24  Q.    More than 100,000?

25  A.    Yes.

71

1  Q.   Do you have an estimate of how much it was or should I

2  keep going?

3  A.   It was a couple hundred thousand.

4  Q.   Couple hundred thousand.  And how long ago do you think

5  that was?

6  A.   Probably a year ago.

7  Q.   At the Borgata.  Because then I think you need another

8  amendment to your statement of financial affairs which is Page

9  363 of 383, question number 15.  You --

10  A.   Can I see that?

11  Q.   -- testified --

12        MS. O'TOOLE:  Sure.

13  Q.   It's 363.  You checked off the box no that you have not

14  had any losses from gambling.

15  A.   I don't -- I can tell you that I haven't had a net loss

16  and that's what I took the question to mean.  For the most

17  part I win.  That time I lost.  And I really didn't lose

18  because I didn't pay them.

19  Q.   So if you lost a couple of hundred thousand dollars about

20  a year ago, then did you win a couple of hundred dollars in

21  the last year as well?

22        MR. ROSEN:  Or before.

23  A.   I'm sure.  I'm sure all before.

24  Q.   Or before?

25  A.   Net, net I didn't lose.  Net, net I didn't lose money.

72

1  Q.   I'll leave that to your attorney.

2  A.   I'm not going to change it.  I'm not going to amend that.

3  Q.   You're going to need to read the question a little bit

4  closer I think.

5  A.   Okay.

6  Q.   All right.  I'll just move on.  On the statement of

7  financial affairs, Page 364, you indicate that you closed 12

8  financial accounts, two in May and eight in April.  That was

9  May and April 2018.  That was after the TRO, correct?

10  A.   Say that again?  What page is this?

11  Q.   It's the next page.

12       MS. O'TOOLE:  364.

13  Q.   Page 364.  So you closed 12 financial accounts.  To my

14  reading it looks like two in May of 2018 and eight in April of

15  2018.  And I believe that's after the TRO from March 28,

16  correct?

17  A.   There was a whole issue with the TRO that it was stayed.

18  Q.   All right.  I was just asking the question.  Was that

19  after the TRO?

20  A.   If you say it was after the TRO, it was after the TRO.

21  Q.   Why did you close all the accounts with them at almost

22  the same time?

23  A.   Because I need the money to live.

24  Q.   But why would you close an account if you needed money?

25  I don't understand.

73

1  A.    Because I didn't want the money in the account.

2  Q.    Where did you put the money?

3  A.    I converted it to cash and I live off of it.

4  Q.    Okay.  So for instance, the account that you closed at --

5         MR. ROSEN:  What page are you on?

6         MS. O'TOOLE:  364.

7  Q.    As I said, it starts at 364 through 366.  It's question

8  number 21 on the statement of financial affairs.  So for

9  instance, the Bank of America account that you closed on April

10 4 with $106,544.94 in it, you asked them to give you that in

11 cash?

12 A.    I don't recall.

13 Q.    Well you just said you took cash from each of these

14 accounts.

15 A.    I said I don't recall.

16        MS. O'TOOLE:  Well, would there be any document that

17 refreshes your recollection as to what happened to that money?

18        MR. D'ALESSIO:  We're going to give you the bank

19 statements.

20 Q.    But the bank statement is going to show the account being

21 closed.  It's not going to show where the money went.  That's

22 what my question is.

23 A.    I can't help you with that.  I don't recall.

24 Q.    There's over $300,000 to my reading of closed, amounts in

25 the closed bank accounts at the time they were closed and you

74

1  don't remember where any of that money went?

2  A.    No, I don't.

3  Q.    Although you did just say that you had it taken out in

4  cash.  Will you amend that answer?  Is that not true?

5  A.    I don't recall.

6          MS. KIRBY:  I don't have any other questions.

7          MR. KYE:  I just have a couple of quick questions.

8          MS. O'TOOLE:  Sure.

9  BY MR. KYE:

10 Q.    Mr. D'Alessio, my name is Matthew Kye.  I represent

11 Preferred Bank.  What is 184 East. 64th Street, Associates?

12 A.    An entity that I own owns a building at that address.

13 Q.    Does it own anything else other than the building?

14 A.    No.

15 Q.    At that address, what is the -- how many units are in

16 that building?

17 A.    I believe five.

18 Q.    Are they all leased out?

19 A.    I have no idea.

20 Q.    Are there any tenants in that building now?

21 A.    I have no idea.

22 Q.    If the tenants were to make payment on these leases, who

23 would they be making payment to?

24 A.    We have nothing to do with it anymore.

25 Q.    Who does?

75

1  A.    I don't know.  We've abandoned -- we closed down the

2  office and we've abandoned the buildings.

3  Q.    So when was the last time you received payment from the

4  tenants?

5  A.    I can't answer that.  I don't recall.

6  Q.    Okay.  Is --

7  A.    I haven't received any payments but --

8  Q.    Is it your testimony --

9          MR. ROSEN:  What's that address again?

10         MR. KYE:   184 East 64th Street.

11  Q.    Is it your testimony there are five units that are

12  residential units?

13  A.    Yes.

14  Q.    And then turning to 227 East 67th Street, what is that?

15  A.    That is the same type of building at that address.

16  Q.    Five units as well?

17  A.    Yes.

18  Q.    Just five residential units?

19  A.    Yes.

20  Q.    And when was the last time you received rental payments

21  on that?

22  A.    I have no idea.  Again, we've abandoned the buildings.

23  Once we closed our office, we've abandoned the buildings.

24  Q.    In either building did you notify the tenants that you

25  were --

76

1  A.   No.

2  Q.   So the tenants -- if the tenants were to make payments to

3  your 12 Water Street address right now, what would happen with

4  that payment?

5  A.   If they make a payment, it would go into a bank account.

6  Q.   Is your mail being forwarded from 12 Water Street?

7  A.   Yes.

8  Q.   Where is it being forwarded to?

9  A.   It gets picked up.  It gets picked up at the White Plains

10  post office.

11  Q.   By who?

12  A.   By myself or Rita.

13  Q.   So is it possible that Rita has been picking up these

14  payments?

15  A.   It's possible.

16  Q.   And what would she be doing with those payments then?

17  A.   She would put them in the bank account.

18  Q.   Which bank account?

19  A.   Under that entity.

20  Q.   So each entity had its own bank account?

21  A.   Correct.

22  Q.   And you have access to that bank account?

23  A.   I have access if I want, sure.

24  Q.   Who else has access to that bank account?

25  A.   Rita.

77

1  Q.   And do you know if Rita pays for any expenses?

2  A.   We don't pay anything.

3  Q.   So is the money just accruing in that bank account?

4  A.   If it comes in.

5  Q.   And what bank is that?

6  A.   That I'm not sure.  It was Preferred and then it was

7  changed.  I don't know what bank it is.

8  Q.   And who would know what bank it is?

9  A.   Rita.

10         MS. O'TOOLE:  I'm just going to interject for a

11  moment because two of the 184 East 64th Street Holdings and

12  Associates, LLC have filed for bankruptcy.  I'm just

13  cautioning you to the extent money is being received and put

14  into a bank account it would be entirely unlawful for anybody

15  to be using that money.

16         MR. D'ALESSIO:  It's not being used.

17         MR. ROSEN:  No one's touching it.

18         MR. D'ALESSIO:  Nobody's touching the money.

19         MS. O'TOOLE:  I'm just saying --

20         MR. ROSEN:  I have told him that.  He's very aware

21  of that.

22         MR. KYE:  I have no further questions.

23         MALE SPEAKER:  Just a couple, please.  I have to

24  leave.

25         MS. O'TOOLE:  Okay.  Go ahead.

78

1          MS. POLLACK:  So do I.

2          MS. O'TOOLE:  I'm sorry.  Go ahead.

3          MS. POLLACK:  Sorry.  Just a couple of questions.

4    Bonnie Pollack of Cullen & Dykman.  You named two --

5          MR. ROSEN:  Hi Bonnie.

6          MS. POLLACK:  Hi Sandy.

7    BY MS. POLLACK:

8    Q.    You named two mezzanine lenders earlier?

9    A.    It's actually one lender but they have two names.  The

10   name of the company is Bluestone.  The name of the entity

11   debt, the entity they opened up for that debt is Throgs Neck

12   Debt.

13   Q.    Do you have an interest in Bluestone?

14   A.    No.  It has no -- unrelated to me.  Totally unrelated.

15   Just the same name.

16   Q.    How old are the children for which the child support --

17   the interest in the two properties [indiscernible] were

18   transferred to your ex-wife for child support?

19   A.    11-year-old boy Justin and -- a 10-year-old boy Justin

20   and 11-year-old girl Jacqueline.  Jacqueline has special

21   needs.  She's like a three-year-old.

22   Q.    Sorry to hear that.

23   A.    Thank you.

24   Q.    And the Boca proceeds which you received in April I think

25   you said --

79

1   A.   I don't recall the date but I received --

2   Q.   And that you spent was also after the TRO, correct?

3   A.   There was a whole issue with the TRO being stayed but I

4   checked with counsel before I did anything so whatever it is,

5   it is.  It'll all come out in the documents.

6   Q.   Which counsel is that?

7   A.   My attorney.

8   Q.   What's his or her name?  I'm not asking you for

9   privileged conversations.  I'm asking his or her name.

10  A.   David Berkey.

11  Q.   Do you know what firm Mr. Berkey is with?

12  A.   I don't know.  It's a long name.  A bunch of names.

13  Q.   Is it in New York is it in --

14  A.   New York.

15          MR. ROSENFELD:  Gallet Dreyer & Berkey.

16          MR. ROSEN:  Who?

17          MR. ROSENFELD:  Gallet Dreyer & Berkey.

18  Q.   And one other thing --

19          MR. ROSEN:  Who's that?  Who's speaking?

20          MR. ROSENFELD:  Mr. Rosenfeld.

21          MR. ROSEN:  Who?

22          MR. ROSENFELD:  Mr. Rosenfeld.

23          MS. O'TOOLE:  Tab Rosenfeld.  He identified himself

24  at the beginning.

25  Q.   Just one other question.  You said earlier in response to

80

1  one of the trustee's questions that you have over 100 entities

2  but there were nowhere near 100 entities listed on the

3  schedules.

4  A.   Yes, there were.

5  Q.   I don't believe there were.  I could be wrong.  Every

6  single one is on there?

7  A.   Yeah.

8  Q.   Okay.

9  A.   You don't have to check it.  They're all there.

10       MS. POLLACK:  All right.  The trustee will verify

11  that.  That's all I have.

12       MR. ROSEN:  Thank you, Bonnie.

13       MR. D'ALESSIO:  Thank you.

14       MS. POLLACK:  Thank you, Sandy.

15       MR. PERLMAN:  May I?

16       MS. O'TOOLE:  Yes.

17       MR. PERLMAN:  Daniel Perlman for John Pantanelli.

18       MR. D'ALESSIO:  Yes.

19  BY MR. PERLMAN:

20  Q.   Can you tell me, please, the status of 937 Post Road?

21  Have you acquired --

22  A.   It's under contract.

23  Q.   Have you acquired the land?

24  A.   It has not been acquired, no.

25  Q.   Is money sitting in an escrow?

81

1  A.    No.

2  Q.    What happened to the money that Pantanelli gave you for

3  that?

4  A.    The money was used to pay investors back.

5  Q.    What investors?

6  A.    My investors.

7  Q.    From what properties?

8  A.    Numerous properties.

9  Q.    Wasn't the money given for a down payment on that

10 property?

11 A.    It was borrowed from that entity --

12 Q.    So you borrowed --

13 A.    -- to pay investors.

14 Q.    So you borrowed from escrow on that to pay other --

15 A.    It wasn't in escrow.

16 Q.    Was it supposed to be deposited in escrow to purchase the

17 land?

18 A.    Absolutely not.  Absolutely not.

19 Q.    So you're still in contract but you don't have any money

20 in escrow for it?

21 A.    Correct.

22         MR. PERLMAN:  Okay.  Go ahead.  Next.

23 BY MS. O'TOOLE:

24 Q.    Let me just ask 947 Post Road, I don't see anything like

25 that on this list.  Was it through a particular entity that

82

1   you purchased that?  What LLC is that?

2   A.   Nothing's purchased.

3   Q.   Okay.  Was there a contract entered into with one LLC and

4   a prospective seller or purchaser?

5   A.   There was a -- there's a contract to buy a property.

6   Q.   Okay.  And what entity was buying --

7   A.   I'm not the principal of that entity.

8   Q.   What is that entity?  Just help me somebody.

9   A.   It's just an entity that's in contract to buy a piece of

10  property.  It owns nothing right now.  It has no assets.

11  Q.   Had you formed an LLC for the purposes of conducting

12  these transactions?

13  A.   Correct.

14  Q.   And what was the name of the LLC?

15  A.   The address, 937 Post Road or something like that.

16  Q.   So when I look at the LLCs on your list --

17  A.   It's not my LLC.

18  Q.   Whose LLC is it?

19  A.   Bill Orecko [Ph.].

20  Q.   And this is the gentleman that you recently started doing

21  business with that you said --

22  A.   Correct.

23  Q.   -- for the last couple of months?

24  A.   Correct.

25          MR. LaMONICA:  I had some questions.

83

1           MS. O'TOOLE:  Just for the purposes of the record

2   again it's Mr. LaMonica speaking.

3   BY MR. LaMONICA:

4   Q.   East 64 Associates wrote you a check last September in

5   2017 for almost $3.4 million, one for 933 and one for 2.3

6   million.  Can you tell me what happened with that money?

7   A.   I can't.

8   Q.   You can't?

9   A.   No.

10  Q.   Do you recall it at all?

11  A.   It's subject to the litigation and we'll deal with it in

12  the litigation.

13  Q.   What litigation?

14  A.   The litigation with them.

15  Q.   Okay.  So you don't --

16  A.   I'm not going to comment about anything to do with the

17  litigation.

18  Q.   But will the documents that involve that --

19  A.   Absolutely.

20  Q.   Will they be on the hard drive?

21  A.   Absolutely.

22           MR. LaMONICA:  That's all I have.

23           MR. ROSENFELD:  I have one, one or two questions.

24           MS. O'TOOLE:  Sure.  Can you just identify yourself?

25           MR. ROSENFELD:  Tab Rosenfeld.

84

1          MS. O'TOOLE:  Thank you.

2          MR. ROSENFELD:  [Inaudible].

3   BY MR. ROSENFELD:

4   Q.   The 1517 Circle Holdings, LLC property, isn't Mr. Rico a

5   member in that entity, invested in that property?

6   A.   I believe he is.

7   Q.   And this membership in that entity happened

8   [indiscernible] two or three months ago, didn't it?

9   A.   I'm sorry?

10  Q.   He was a member of that entity quite a bit of time ago,

11  wasn't he?  The last two or three months he became a member,

12  correct?

13  A.   He's a member, I don't know, several months.

14          MS. O'TOOLE:  Where does Mr. Orecko live?

15          MR. D'ALESSIO:  Scarsdale.

16          MS. O'TOOLE:  Do you know his address?

17          MR. D'ALESSIO:  No.

18          MS. O'TOOLE:  You don't?

19          MR. D'ALESSIO:  No.  I can get it to you.

20          MS. O'TOOLE:  Okay.

21  Q.   And he's also a guarantor of the investments in that

22  property, isn't he?

23  A.   Yes, he is.

24  Q.   And he became a guarantor more than two or three months

25  ago, didn't he?

85

1   A.   I have no idea.

2   Q.   Well, it's fair to say that you were doing business with

3   Mr. --

4   A.   I'm not going to answer any more of your questions

5   subject to the litigation.  We'll deal with it in the

6   litigation.

7   Q.   I'm allowed to ask you questions regarding --

8   A.   You can ask whatever you want.

9   Q.   -- the bankruptcy petition that are relevant to the

10  statements you made before the trustee.

11  A.   Okay.

12  Q.   Are you refusing to answer the questions?

13       MR. ROSEN:  Yeah, he is.

14  Q.   You're refusing to answer questions?

15       MR. ROSENFELD:  I didn't ask you.

16  Q.   You're refusing to answer?  You're not willing to tell me

17  in this proceeding when Mr. Rico became involved in the 1517

18  Circle Holdings?

19  A.   I don't recall a date.

20       MR. ROSEN:  You applied for a 2004 order.  You'll

21  get your order and you can examine him till the cows come

22  home.

23       MR. ROSENFELD:  I'm allowed to ask questions at a

24  341 exam as well.

25       MR. ROSEN:  You are but --

86

1          MR. ROSENFELD:  Excuse me.

2          MR. ROSEN:  Okay.

3          MR. ROSENFELD:  Let me finish my statement.

4          MR. D'ALESSIO:  It's no problem.

5          MR. ROSEN:  Finish your statement.

6          MR. ROSENFELD:  I'm going to ask questions in this

7    context of this proceeding.

8          MR. D'ALESSIO:  Ask whatever you like.

9          MR. ROSENFELD:  [Inaudible] my right to ask

10   questions in a 2004 examination.  And it's pertinent to what

11   the trustee asked.

12   Q.   So I'm trying to understand because the trustee asked you

13   when Mr. Rico became involved in the Circle Holdings property.

14   A.   I don't recall the date and the trustee will get all the

15   documents and have a clear record of all the documents.

16          MS. O'TOOLE:  Anybody else have any questions?

17   Q.   What happened to the original records, the original

18   subscription agreements, the original operating agreements,

19   the original signatures --

20   A.   There are no original.  We're paperless.

21   Q.   You received papers --

22   A.   We're paperless.

23   Q.   Let me ask the question, please.  You had investors in

24   your various LLCs that you sent subscription agreements to,

25   you sent operating agreements to and other types of documents

87

1   to invest in the companies, correct?

2   A.   It's all sent through the computer.

3   Q.   And you got documents back from them?

4   A.   Through the computer.

5   Q.   So no one sent you hard copies of documents in any of the

6   investments that are listed on the schedules --

7   A.   No.

8   Q.   -- in your bankruptcy schedules.  Is that your testimony?

9   A.   Yes.

10        MALE SPEAKER:  I did.

11        MS. O'TOOLE:  How about employment records for your

12   employees?  Were those maintained on paper?

13        MR. D'ALESSIO:  No.  We had a payroll company.

14        MS. O'TOOLE:  If somebody gave you a W-2 or elected

15   to do something with benefits, how would you do that?

16        MR. D'ALESSIO:  There's no benefits.

17        MS. O'TOOLE:  But if they filled out a W-2, they did

18   it online or a --

19        MR. D'ALESSIO:  Scanned it.  Everything is on the

20   computer.

21        MS. O'TOOLE:  But then were the documents shredded

22   after they were scanned?

23        MR. D'ALESSIO:  Yes.

24        MS. O'TOOLE:  Everything --

25        MR. D'ALESSIO:  Everything's shredded.

88

1          MS. O'TOOLE:   -- as soon as it was scanned it was

2    shredded?

3          MR. D'ALESSIO:   Correct.

4          MS. O'TOOLE:   Okay.   Sir, if you'd identify yourself

5    and --

6          MR. WEST:   Andrew West.

7          MS. O'TOOLE:   Okay.

8          MR. WEST:   And I have a question.

9          MS. O'TOOLE:   You have to be really loud because

10   we're over here on a cruddy little machine.

11   BY MR. WEST:

12   Q.   I have a question regarding any -- Mr. D'Alessio, do you

13   have any foreign bank accounts or own any foreign businesses,

14   foreign real estate?

15   A.   No.

16   Q.   Nothing in the Dominican or the Caribbean?   Have you

17   ever?

18   A.   No.

19   Q.   Do you intend to?

20   A.   Can't tell you what I intend to do.

21   Q.   No contracts I mean.

22   A.   No contracts.

23          MR. WEST:   Okay.

24          MS. O'TOOLE:   Okay.   At this point the meeting's not

25   concluded but adjourned.   We'll adjourn until July 12th at 5

89

1   p.m.  I'm not saying you're going to come back on that date.

2   If there's another time we want to reconvene, we will figure

3   it out, and we will notice it to anybody who's here.  Read the

4   docket.  And when it says 5 o'clock, do not show up downstairs

5   and start asking the guard where's O'Toole, it's supposed to

6   be at 5.  It's a control time.  If I put it at 5, it's close

7   of business,  Okay?  Thank you all.

8             ALL:  Thank you.

9                        *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

90

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                              _Mary Greco_
   _____

6                                Mary Greco

7  Dated:  July 19, 2018